903 A.2d 388

**Todd Lin CHOW**

v.

**STATE of Maryland.**

**No. 99, Sept. Term, 2005.**

Court of Appeals of Maryland.

July 27, 2006.

---

Michael Wein (David M. Simpson, on brief), Greenbelt, MD, for Petititoner.

Gregory D'Alesandro, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, MD for Respondent.

Argued before BELL, C.J., and RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, J.

This case concerns whether the temporary gratuitous exchange or loan of a regulated firearm[1] between two adult

---

1. Maryland Code (1957, 1996 Repl.Vol., 2002 Supp.), Art. 27, § 441(r) defines "Regulated Firearm":

individuals, who were otherwise permitted to own and obtain a handgun, constitutes an illegal transfer of a firearm in violation of Maryland Code (1957, 1996 Repl.Vol., 2002 Supp.), Art. 27, § 442.[2] The particular issue before us is the contextual meaning of the word "transfer," as it is used in § 442(d), "A person who is not a regulated firearms dealer may not sell, rent, *transfer*, or purchase any regulated firearm...." (Emphasis added). Thus, we must decide whether a temporary gratuitous exchange or loan of a regulated firearm constitutes a "transfer" under § 442(d). In addition, we will discuss Maryland Code (1957, 1996 Repl.Vol., 2002 Supp.), Art. 27, § 449,[3] which establishes the penalty for a violation of § 442(d), to determine the proper *mens rea* for such violation.

---

*"Regulated firearm.*—'Regulated firearm' means:

(1) Any handgun as defined in this section; or

(2) Any assault weapon as defined in this section."

**2.** Maryland Code (1957, 1996 Repl.Vol., 2002 Supp.), Art. 27, §§ 441 *et seq.* composes the "Regulated Firearms" subheading. Section 442 states in pertinent part:

"(d) *Sale by other than regulated firearms dealer.*—(1) A person who is not a regulated firearms dealer may not sell, rent, transfer, or purchase any regulated firearm until after 7 days shall have elapsed from the time an application to purchase or transfer shall have been executed by the prospective purchaser or transferee, in triplicate, and the original copy is forwarded by a regulated firearms dealer to the Secretary."

Pursuant to Chapter 5, Acts 2003, effective October 1, 2003, the "Regulated Firearms" subheading was repealed and re-enacted as Maryland Code (2003), §§ 5–101 *et seq.* of the Public Safety Article. Section 442 is currently codified (without substantial change) as § 5–124 of the Public Safety Article. All events at issue in this case took place in April of 2003, therefore, we shall, unless otherwise indicated, refer to the version of the statute in effect at that time, Maryland Code (1957, 1996 Repl.Vol., 2002 Supp.), Art. 27, §§ 441 *et seq.*

**3.** Maryland Code (1957, 1996 Repl.Vol., 2002 Supp.), Art. 27, § 449 states in pertinent part:

"(f) *Knowing participants in sale, rental, etc.*—Except as otherwise provided in this section, any dealer or person who knowingly participates in the illegal sale, rental, transfer, purchase, possession, or receipt of a regulated firearm in violation of this subheading shall be guilty of a misdemeanor and upon conviction shall be fined not more than $10,000 or imprisoned for not more than 5 years, or both. Each violation shall be considered a separate offense."

On July 31, 2003, petitioner, Todd Lin Chow, a District of Columbia Metropolitan Police Department officer and non-dealer of firearms, was charged with illegally transferring a regulated firearm pursuant to § 442. On November 25, 2003, a bench trial was held in the Circuit Court for Prince George's County. On December 1, 2003, the court issued its ruling, finding petitioner guilty. The court sentenced petitioner to sixty (60) days, suspended the sentence and imposed a two hundred dollar ($200) fine. A timely appeal was made to the Court of Special Appeals and on June 2, 2005, after hearing arguments, the court filed its decision affirming the decision of the Circuit Court. *Chow v. State*, 163 Md.App. 492, 881 A.2d 1148 (2005). Petitioner then timely filed a Motion for Reconsideration, which was denied on October 4, 2005. On October 19, 2005, petitioner timely filed a petition for writ of certiorari to the Court of Appeals. We granted certiorari on December 19, 2005. *Chow v. State*, 390 Md. 284, 888 A.2d 341 (2005).

Petitioner presented three questions in his Petition for Writ of Certiorari [4] which we rephrase to consolidate and clarify the issues:

---

Section 449 is currently codified (without substantial change) as § 5–143 of the Public Safety Article.

**4.** Petitioner's questions, as phrased in his Petition for Writ of Certiorari, were as follows:

"1. Whether a 'temporary transfer' or loan of a firearm constitutes a 'transfer' under Art. 27 § 442 when; (1) 'transfer' is not defined anywhere in the subheading, (2) the dictionary definition of transfer includes both a possessory transfer and legal (title or ownership) transfer, and (3) for greater than 60 years the legislature has consistently used the term 'transfer' to apply to regulated firearm transactions, while also consistently prohibiting even the unrecorded 'loan' of a machine gun since 1933 and there is no legislative history otherwise to indicate that 'transfers' include loans?

"2. Assuming *arguendo* that a 'temporary transfer' can in certain circumstances be construed as a 'transfer' under the law, do those circumstances include a short period of time of lending a gun between two adult individuals who are both eligible to own firearms, if the time period of the loan (as in this case) was for about a day"?

"3. Was there sufficient evidence for a rational fact finder to convict the Petitioner of knowingly violating Art. 27 § 442 when; (1) the State never introduced any evidence of an element of the crime,

I. Whether the temporary gratuitous exchange or loan of a regulated firearm between two adult individuals, who were otherwise permitted to own and obtain a regulated firearm, constitutes an illegal "transfer" of a firearm in violation of Maryland Code (1957, 1996 Repl.Vol., 2002 Supp.), Art. 27, § 442, as "transfer" is utilized in subsection (d)(1), "A person who is not a regulated firearms dealer may not sell, rent, *transfer*, or purchase any regulated firearm ... ?" (Emphasis added).

II. Whether Maryland Code (1957, 1996 Repl.Vol., 2002 Supp.), Art. 27, § 449(f), which states, "any dealer or person who *knowingly* participates in the illegal ... transfer ... of a regulated firearm in violation of this subheading ...," establishes a general intent or specific intent *mens rea?* (Emphasis added).

In response to the first question we hold that the plain language and legislative history of the "Regulated Firearms" subheading indicates that the word "transfer," as used in § 442(d), is used in an ownership context and does not apply to the situation extant in the case *sub judice*—that of a gratuitous temporary exchange or loan between two adults who are otherwise permitted to own and obtain regulated firearms. Although we need not reach the second question because of our disposition in regards to the first question, we will discuss the requisite *mens rea* required by § 449(f) because of the likelihood that the issue may come before the Court again. For the reasons that follow, we hold that the word "knowingly" in § 449(f), in the particular circumstance of the applicable statutory scheme at issue here, indicates a specific intent *mens rea*—which we find the petitioner not to have possessed.

---

namely whether the transferee filed the paperwork with the State police, and (2) the facts as noted by the Court of Special Appeals themselves demonstrate that any 'temporary transfer' was an unintentional accident that the Petitioner intended to immediately rectify?"

## I. Facts

We adopt, in part, the facts as stated by the Court of Special Appeals in its opinion below:

"[Petitioner's] friend, Man Nguyen, was the State's main witness at trial. Nguyen testified that, while driving his car on April 1, 2003, he was stopped by the Prince George's County Police Department for a broken taillight. At that time, the police searched Nguyen's vehicle, and discovered a Glock semi-automatic pistol (not the weapon that is the subject of this appeal). The pistol was properly registered in Nguyen's name, but he did not have a permit to carry it. The police confiscated it in connection with their investigation of a recent murder of one of Nguyen's friends.

"The following day, Nguyen contacted [petitioner]. Nguyen explained to [petitioner] that this gun and other guns at his home had been confiscated by the police, and he was 'anxious' to buy another gun. He told [petitioner] that he needed to purchase a gun for protection, by which he meant '[h]ome security,' '[s]o, [petitioner] offered me his gun.'

"The two men arranged to meet later that day for lunch at a restaurant in Bowie, Maryland. Sometime during this meeting, [petitioner] gave Nguyen a nine millimeter, semi-automatic handgun that he had owned since 1996.

"Nguyen told [petitioner] that he wanted to test fire the weapon before purchasing it. The pair got into Nguyen's vehicle and headed to a firing range in Upper Marlboro. En route, Nguyen received a business call on his cellular telephone, requiring that he abort the trip to the firing range. Nguyen drove [petitioner] back to the restaurant where [petitioner's] car was parked and dropped him off. [Petitioner's] weapon remained in Nguyen's car. No money was exchanged between Nguyen and [petitioner].

"Soon thereafter, Nguyen contacted [petitioner] by telephone. Nguyen testified: 'I was interested in buying it and I called him, and, you know, I told him I'd give it back to him but he said, that's cool, just keep it in the house and he'll pick it up.' Nguyen further testified that he anticipat-

ed the weapon would be returned to appellant 'as soon as possible.' "

"Detective Donnie Judd testified as a State's witness. He reported that, on April 4, 2003, he and other members of the Prince George's County Police Department stopped Nguyen on a warrant to arrest him for having illegally carried the gun that was found in his car three days earlier. In the ensuing search of Nguyen's car, the police discovered [petitioner's] loaded handgun in the car's center console. Detective Judd ran an NCIC [5] check and determined that the handgun had not been reported stolen. The gun was test fired and determined to be operable.

"Nguyen was arrested and taken to the police station, where he gave a four-page statement. The first paragraph of the statement addressed how he had obtained [petitioner's] handgun, and that portion of the statement was admitted into evidence. It varied from Nguyen's trial testimony. Ngyuen wrote:

I know [sic] [petitioner] for 2–3 [years]. I was detain [sic] on 4–1–03 and PGPD took all my guns. Next [d]ay, I called [petitioner] and asked him if I could hold on to his gun until I can get my guns back in a week or two because I felt uncomfortable without a gun[.] We then met at Olive Garden att [sic] 4pm in Bowie and had lunch and after that he give [sic] me his 9mm, out of a bag in the front Passengers [sic] seat[.]

"Sergeant William Szimanski, of the State Police Licensing Division, Firearms Registration Section, performs background checks on persons purchasing regulated firearms in Maryland and deals with records concerning firearms purchases. He testified that the records related to [petitioner's] handgun reflect that [petitioner] bought the handgun in November 1996, and it was formally transferred to him

---

5. "The acronym 'NCIC' stands for the National Crime Information Center. Managed by the FBI, this nationwide system provides information to federal, state and local criminal justice agencies." *Chow,* 163 Md.App. at 498 n. 3, 881 A.2d at 1152 n. 3.

on the 27th of that month, after completion of the weapon registration process. The records show no subsequent transfer of the handgun, and no application for a transfer of the gun from [petitioner] to Nguyen.

"Sergeant Guillermo Rivera, of the Office of Internal Affairs of the District of Colombia Metropolitan Police Department, also testified. He stated that appellant had not filed a stolen weapon report between November 17, 2001 and November 17, 2003.

"At the close of the State's case, [petitioner] made a motion for judgment of acquittal. [Petitioner] argued that § 442(d) does not cover his conduct, which was simply a temporary exchange of the handgun. In the alternative, [petitioner] argued that he did not 'knowingly' violate the statute, as required by § 449(f), because the State did not prove that he knew the transferee, Nguyen, had not filed the application required by § 442(d).

"The State countered that [petitioner's] leaving the gun with Nguyen was a 'transfer' of it, and therefore was covered by § 442(d). The State further argued that [petitioner] was aware of the requirements for transferring a handgun, because he had fulfilled those requirements himself when he purchased the gun in 1996. The State finally argued that the 'plain meaning' of transfer does not necessarily include the conveyance of title, and encompasses a mere loan.

"After hearing from counsel on both issues, the [Circuit Court for Prince George's County] denied the motion. [Petitioner] then rested without putting on any evidence, and the court issued its ruling."

*Chow*, 163 Md.App. at 497–500, 881 A.2d at 1151–52 (some footnotes omitted).

The Circuit Court stated:

"The Court having reviewed the statute [§ 442(d) ] and now the burden is on the State to prove beyond a reasonable doubt, the Court finds based upon the testimony of the

State's witnesses that there was in fact a transfer in this case.

"The Court also finds that based upon the facts that it was a *temporary* transfer.

"*It is the Court's assessment of the testimony of the State's witness that it was in fact a loan,* although he has testified to two totally opposite things; he testified that it was in fact an anticipated purchase, and on the other hand, there was testimony or at least—yeah, there was testimony that it was in fact a loan. So, we have two inconsistent statements by the State's witness.

"And the State asks the Court or states to the Court—argues to the Court that under either theory, that there was an illegal transfer in this case. The court agrees that there was an illegal transfer.

"And [petitioner's counsel], I understand your argument with respect to temporary transfer, and I'll leave it to the higher courts to tell me that a temporary transfer is not a transfer under the law, *I believe under the facts and circumstances of this case it is in fact a temporary transfer.*

"And whether the legislature intended a transference to be a part of this statute, this Court finds it's not clear, but I'll wait for direction from the higher court with that." [Emphasis added.]

The trial court judge then found petitioner guilty and sentenced him to sixty (60) days—with the sentence suspended—and a fine of two hundred dollars ($200). In doing so, the trial judge stated: "And the reason why I'm giving you the disposition is *I believe that it was a temporary transfer,* it was illegal, but, what the transferee did with it [the regulated firearm] was not within your control, and he clearly stated on the record that you told him to put it in the house, and he chose not to." [Emphasis added].

Petitioner timely noted an appeal to the Court of Special Appeals. On June 2, 2005, The Court of Special Appeals filed its opinion. The court affirmed the decision of the Circuit

Court. Specifically, in reference to the interpretation of the word "transfer," the court stated:

> "[W]e hold that plainly included within the meaning of 'transfer' of a regulated firearm, in § 442(d), is lending a firearm. The plain construction of the term is confirmed by an examination of the general purpose of the regulated firearms [subheading], and by the rule that the remedial portions of a statute are to be liberally construed. Therefore, a person violates § 442(d) by lending a regulated firearm to another person without there first being compliance with the application process and seven-day waiting period set forth in that section."

*Chow*, 163 Md.App. at 509–10, 881 A.2d at 1158 (footnote omitted). The court, however, failed to address the entire issue of what *would* constitute a transfer: "We need not decide in this case what other facts would support a transfer, for purposes of § 442(d). It is therefore unnecessary to address the scenario postulated by [petitioner], i.e., a mere momentary exchange of a regulated firearm between the lawful possessor and another person." *Id.* at 510 n. 7, 881 A.2d at 1158 n. 7. In addition, in respect to the *mens rea* requirement of § 449(f), the court held "that 'knowingly participates' in a violation of § 442(d) means participation with knowledge of the facts that make out a violation of that subsection" and that "[t]he State, then, need only prove that the defendant participated in a transfer of a regulated firearm with the knowledge that a firearm (as opposed to some other item) was being intentionally (as opposed to accidentally) transferred." *Id.* at 513, 881 A.2d at 1160 (citing *Dawkins v. State*, 313 Md. 638, 651, 547 A.2d 1041 (1988)).

## II. Standard of Review

The case *sub judice* was tried in the circuit court without a jury, thus our standard of review is dictated by Maryland Rule 8–131(c). We recently stated in *Gray v. State*, 388 Md. 366, 879 A.2d 1064 (2005):

> "According to Maryland Rule 8–131(c) 'when an action has been tried without a jury, the appellate court will review

the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.' The clearly erroneous standard does not apply to legal conclusions. *Nesbit v. GEICO,* 382 Md. 65, 72, 854 A.2d 879, 883 (2004). 'When the trial court's order "involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review.' " *Nesbit,* 382 Md. at 72, 854 A.2d at 883 (quoting *Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609, 612 (2002))."

*Gray,* 388 Md. at 374–75, 879 A.2d at 1068. Therefore, we shall review the legal questions presented as to the interpretation of "transfer" in § 442(d) and the *mens rea* element of § 449(f) *de novo.*

### III. Discussion

### A. The Meaning of "Transfer" in the Context of § 442(d).

■ Section 442(d) of the Regulated Firearms subheading governs the sale or "transfer" of regulated firearms by an individual that is not a regulated firearms dealer. As stated *supra,* the statute states, in pertinent part:

"(d) *Sale by other than regulated firearms dealer.*—(1)  A person who is not a regulated firearms dealer may not sell, rent, *transfer,* or purchase any regulated firearm until after 7 days shall have elapsed from the time an application to purchase or transfer shall have been executed by the prospective purchaser or transferee, in triplicate, and the original copy is forwarded by a regulated firearms dealer to the Secretary."

§ 442(d)(1) (emphasis added).

Petitioner contends that the legislative intent of using the term "transfer," as found in § 442(d), was to mean a permanent exchange of title or possession of a regulated firearm, as

in a gift or bequeathment, rather than a mere loan or temporary exchange of such firearm. The State, in opposition, argues that § 442(d) prohibits *all* exchanges of regulated firearms, temporary or permanent, whether by sale, rental, gift, loan, exchange or otherwise and no matter how temporary.

In order to divine the meaning of "transfer" in § 442(d) we look to the canons of statutory interpretation, which we recently expressed in *Kushell v. Department of Natural Resources*, 385 Md. 563, 870 A.2d 186 (2005):

> "The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature. *See Collins v. State*, 383 Md. 684, 688, 861 A.2d 727, 730 (2004). Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology. *Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487 (2004).

> "In construing the plain language, '[a] court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the statute with forced or subtle interpretations that limit or extend its application.' *Price v. State*, 378 Md. 378, 387, 835 A.2d 1221, 1226 (2003); *County Council v. Dutcher*, 365 Md. 399, 416–417, 780 A.2d 1137, 1147 (2001). Statutory text 'should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory.' " *Collins*, 383 Md. at 691, 861 A.2d at 732 (quoting *James v. Butler*, 378 Md. 683, 696, 838 A.2d 1180, 1187 (2003)). The plain language of a provision is not interpreted in isolation. Rather, we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect. *Deville*, 383 Md. at 223, 858 A.2d at 487; *Navarro–Monzo v. Washington Adventist*, 380 Md. 195, 204, 844 A.2d 406, 411 (2004).

> "If statutory language is unambiguous when construed according to its ordinary and everyday meaning, then we give effect to the statute as it is written. *Collins*, 383 Md. at 688–89, 861 A.2d at 730. If there is no ambiguity in that

language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends; we do not need to resort to the various, and sometimes inconsistent, external rules of construction, for 'the Legislature is presumed to have meant what it said and said what it meant.' *Arundel Corp. v. Marie,* 383 Md. 489, 502, 860 A.2d 886, 894 (2004) (quoting *Witte v. Azarian,* 369 Md. 518, 525, 801 A.2d 160, 165 (2002))."

*Kushell,* 385 Md. at 576–77, 870 A.2d at 193–94. Furthermore, as we stated in *Price v. State,* 378 Md. 378, 835 A.2d 1221 (2003):

"In some cases, the statutory text reveals ambiguity, and then the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal. However, before judges may look to other sources for interpretation, first there must exist an ambiguity within the statute, i.e., two or more reasonable alternative interpretations of the statute. Where the statutory language is free from such ambiguity, courts will neither look beyond the words of the statute itself to determine legislative intent nor add to or delete words from the statute. Only when faced with ambiguity will courts consider both the literal or usual meaning of the words as well as their meaning in light of the objectives and purposes of the enactment. As our predecessors noted, 'We cannot assume authority to read into the Act what the Legislature apparently deliberately left out. Judicial construction should only be resorted to when an ambiguity exists.' Therefore, the strongly preferred norm of statutory interpretation is to effectuate the plain language of the statutory text."

*Price,* at 387–88, 835 A.2d at 1226 (citations omitted); *Goff v. State,* 387 Md. 327, 342, 875 A.2d 132, 141 (2005); *Pete v. State,* 384 Md. 47, 57–58, 862 A.2d 419, 425 (2004).

### 1. *Plain Language of § 442(d).*

First, it is necessary to look at the plain language of § 442(d) to determine whether there is any ambiguity in the term "transfer" as it is used in the context of the statute. The

term itself is not defined within the subheading. *See Chow,* 163 Md.App. at 502, 881 A.2d at 1154 ("Neither § 442 nor any other section within that subheading defines the word 'transfer.' "). Therefore, we look to the ordinary and popular understanding of the word "transfer" to determine its meaning. *Kushell, supra.*

There are a number of sources from which we can obtain definitions of the word "transfer" and it is proper to consult a dictionary or dictionaries for a term's ordinary and popular meaning. *State Dep't of Assessments and Taxation v. Maryland–National Capital Park and Planning Comm'n,* 348 Md. 2, 14, 702 A.2d 690, 696 (1997) ("[I]n deciding what a term's ordinary and natural meaning is, we may, and often do, consult the dictionary."); *Hackley v. State,* 161 Md.App. 1, 14, 866 A.2d 906, 914 (2005). The Court of Special Appeals looked at two different sources for definitions:

> "The first definition of the verb 'transfer' in The Random House Dictionary of the English Language is 'to convey or remove from one place, person, etc., to another[.]' The Random House Dictionary of the English Language, Unabridged 2009 (2nd ed. 1987) ('Random House'). A similar first definition of the verb 'transfer' is found in Black's Law Dictionary: 'To convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control of.' Black's Law Dictionary 1536 (8th ed. 2004) ('Black's'). These definitions are broad and both include a loan of the property at issue.
>
> "To be sure, other subsequently listed dictionary definitions of the verb 'transfer' are more in keeping with the construction given to it by [petitioner]. Random House includes as the third definition of the verb: '*Law.* to make over the possession or control of: *to transfer a title to land.*' Random House, *supra,* at 2009. And Black's lists, as its second definition, 'To sell or give.' Black's, *supra,* at 1536. Similarly, Random House defines the noun form of the word 'transfer' as, *inter alia,* '*Law,* a conveyance, by sale, gift, or otherwise of real or personal property, to another.' Ran-

dom House, *supra*, at 2009. And 'conveyance' is defined, *inter alia*, as '*Law.* **a.** the transfer of property from one person to another.' *Id.* at 445, 866 A.2d 906."

*Chow*, 163 Md.App. at 502–03, 881 A.2d at 1154. Utilizing these definitions and the context in which "transfer" appears in § 442(d), the Court of Special Appeals decided to "decline [petitioner's] invitation to ascribe to the verb 'transfer,' in § 442(d), a definition suggestive only of a permanent exchange of title or possession." *Chow*, 163 Md.App. at 503, 881 A.2d at 1154. We, however, disagree with the Court of Special Appeals' determination in this instance.

As stated *supra*, there are different sources from which definitions of a word may be obtained.[6] Petitioner points out a number of definitions from dictionaries which were available in the Maryland State Law Library prior to the initial 1941 enactment of the predecessor statute to the Regulated Firearms subheading.[7] All of the definitions define "transfer" as a

---

6. Judge Harrell, writing for the Court in *Harvey v. Marshall*, 389 Md. 243, 884 A.2d 1171 (2005), expressed some concerns the Court has about singularly relying on recent dictionary editions to establish the meaning of words in a statutory scheme:

"Although appellate courts frequently consult and rely on dictionary definitions in their analysis of statutory language, often without explanation for why a particular dictionary was consulted, the question as to which edition of a particular dictionary is utilized in a given situation presents a more puzzling inquiry. Sometimes it seems that random chance is determinative, based on whatever edition is on a library shelf within reach of the author at the time of composition of the opinion. *Because we are attempting to ascertain the intent of the Legislature in choosing certain language at a point in time, resort to a dictionary, legal or otherwise, should logically include consultation of those editions (in addition to current editions) of dictionaries that were extant at the time of the pertinent legislative enactments.* See *Rossville Vending Mach. Corp. v. Comptroller of Treasury*, 97 Md.App. 305, 316–18, 629 A.2d 1283, 1289–90 (1993) (stating that '[i]t seems logical, at least in a linear way, that a popular dictionary of [the time in which a statute was enacted] would be an informative resource in attempting to arrive at a determination. . . .')."

*Harvey*, 389 Md. at 260–61 n. 11, 884 A.2d at 1181 n. 11 (emphasis added).

7. The statute was initially enacted in 1941, pursuant to the Laws of Maryland, Chapter 622, and codified in the "Crimes and Punishments"

permanent exchange of title or possession.[8]  From the time of
its initial enactment in 1941, through its evolution to the
present day, the statute has always contained a form of the
term "transfer."  It is persuasive that the use of the term
"transfer" has remained consistent throughout the evolution of
the statute—always in the context of a transfer of all of the
rights of the transferor to the transferee, either permanently
or for an extended period of time if a gun is "rented."  Thus,
the meaning and context of the term have not been altered
over the course of the years, even though other definitions
may have changed.

The Court of Special Appeals found that an interpretation of
"transfer" as suggestive only of a permanent exchange of title

---

title, under the subtitle "Pistols," in Maryland Code (1939, 1943 Supp.),
Art. 27, §§ 531A–531G.  It states, in pertinent part:

"A true record shall be made by each dealer in a book kept for the
purpose, the form of which shall be prescribed by the Secretary of
State, of all pistols or revolvers sold, *transferred* or otherwise disposed
of at wholesale or retail, which said record shall contain the date of
sale, the caliber, make, model and manufacturer's number of the
weapon, to which shall be added the name and address of the
purchaser. . . ."

Chapter 622   § 1, 531B, of the Acts of 1941.  The reference to "whole-
sale or retail" indicates a business transaction.

**8.**  *Adjudged Words and Phrases* defines transfer as, "The term *transfer*
means to convey or pass over the right of one person to another" and
"[t]he act by which the owner of a thing delivers it to another person,
with the intent of passing the right he had in it to the latter."  Charles
H. Winfield, *Adjudged Words and Phrases* 611 (1882).

*Bouvier's Law Dictionary* defines transfer as "[t]he act by which the
owner of a thing delivers it to another person, with the intent of passing
the rights which he has in it to the latter."  *Bouvier's Law Dictionary*
3308 (1914).

*The Collegiate Law Dictionary* defines transfer, in pertinent part, as:
"**1.**  The act by which the owner of a thing delivers it to another
person, with the intent of passing the rights he had in it to the latter.
**2.** Any act by which the owner of anything delivers or conveys it to
another with the intent to pass his rights therein. . . . **4.** To remove. **5.**
To change the location, place, or relation of."

*The Collegiate Law Dictionary* 319 (1925) (citations omitted).

*The Cyclopedic Law Dictionary* defines transfer as "[t]he act by which
the owner of a thing delivers it to another person, with the intent of
passing the rights which he has in it to the latter."  *The Cyclopedic Law
Dictionary* 1115 (3rd ed.1940).

or possession "would run afoul of the rule that '[o]rdinary and popular understanding of the English language dictates interpretation of terminology within legislation.'" *Chow*, 163 Md. App. at 503, 881 A.2d at 1154 (citing *Deville*, 383 Md. at 223, 858 A.2d 484). The court, however, provides no support for this conclusion other than what can be inferred from its discussion of the two dictionary definitions it provided, *supra*, which arguably supported both the petitioner's and the State's arguments. Analyzing "transfer" in light of the definitions in effect at the time of the legislative enactment of § 442(d), we do not find petitioner's interpretation of "transfer" to run afoul of the ordinary and popular understanding of the English language.

■ Words can have multiple meanings and often do. And the numerous meanings of a particular word may each satisfy the ordinary and popular understanding of that word. In order to interpret a word's specific meaning in a particular statute we look to the context in which the word is used. As we stated *supra*, "The plain language of a provision is not interpreted in isolation. Rather, we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect. *Deville*, 383 Md. at 223, 858 A.2d at 487; *Navarro–Monzo v. Washington Adventist*, 380 Md. 195, 204, 844 A.2d 406, 411 (2004)." *Kushell*, 385 Md. at 577, 870 A.2d at 193.

### 2. *"Transfer" in the Context of the Regulated Firearms Subheading.*

While the Regulated Firearms subheading does not specifically define the term "transfer," it does use the term several times throughout its various sections. Section 441 provides the definitions for the subheading. In particular, § 441(f) states that: " 'Dealer' means any person who is engaged in the *business* of: (1) Selling, renting, or *transferring* firearms at wholesale or retail." (Emphasis added). Transfer, as used in this section, obviously concerns transfers for consideration ("wholesale" and "retail" are business terms). Section 441(t) states that: " 'Rent' means the *temporary transfer* of a regu-

lated firearm *for consideration* where the firearm is taken from the firearm owner's property." (Emphasis added). Finally, § 441(w) states that: " 'Straw purchase' means any sale of a regulated firearm where the individual uses another person (the straw purchaser) to complete the application to purchase a regulated firearm, take initial possession of that firearm, and subsequently *transfer* that firearm to the individual." (Emphasis added). This section also obviously concerns transfers for consideration. In all of the above instances (except where "Rent" is specifically defined and delineated as a temporary transfer for consideration) the word "transfer" is used in the sense of a permanent exchange of title or possession of the regulated firearm for consideration. A dealer is a person engaged in the business of permanently exchanging title or possession of a firearm. In the context of § 441(f), transfer logically means a permanent exchange. In the case of a straw *purchase,* there is a sale of a regulated firearm to the strawperson, who then *transfers* (permanently exchanging possession of) the firearm to another individual. The use of transfer in § 441(w) also contemplates permanent exchange of possession for consideration.

Section 442, entitled "Sale or transfer of regulated firearms," utilizes "transfer" in several instances, including subsection (d), the subject provision in the case *sub judice.* Subsection (b)(3)(i) states that "[a]n application [9] to purchase or *transfer* a regulated firearm shall be completed by the recipient and forwarded to the Secretary within 5 days of receipt of the regulated firearm. . . ." Reference to the application form itself (MSP 77R–1) is reflective of "transfer" having a "permanent exchange" connotation.

The form is entitled: "MARYLAND STATE POLICE APPLICATION AND AFFIDAVIT TO PURCHASE A REGULATED FIREARM." The first section provides instructions, which begin: "The *transferee (purchaser)* or voluntary registrant *must complete Part 1 of this application prior to*

---

9. The form of the application is not contained in the statute.

*completing Part 2.*" [Italics added for emphasis]. The rest of the page composes Part 1 of the application and, following the instruction block, fifteen questions are listed with yes or no (and sometime N/A) circles to be filled in by the applicant, along with a space for the applicant to initial for each question's answer. At the bottom of the page there is a signature box. The box is labeled "Signature of *Transferee* /Voluntary Registrant and *Transferor*." [Emphasis added]. Two lines are provided for signatures: (1) labeled "*Transferee* /Voluntary Registrant" and (2) "*Dealer/Transferor*." [Emphasis added].

The second page of the application composes Part 2. Located at the top of the page are four check boxes, respectively labeled: "Dealer Sale," "Secondary Sale," "Gift," and "Voluntary Registration." Below that is an instruction box which states:

"The *transferee (purchaser* ) or voluntary registrant *must complete Part 1 of this application prior to completing Part 2.* Licensed dealers or *transferors (sellers* ) *must* visually inspect an official document provided by the *transferee* to verify that the *transferee* has either completed a certified firearms safety training course . . . or an official document that indicates that the *transferee* is a current law enforcement officer. . . ." [Italics added for emphasis.]

Following the instruction box, the page is broken into six sections with section two composed of an A and B. Each individual section is entitled as follows: 1. "*TRANSFEREE (PURCHASER* )/VOLUNTARY REGISTRANT INFORMATION," 2a. "DEALER INFORMATION (* * *For Licensed Dealer Sales Only* * *)," 2b. "*TRANSFEROR (SELLER* ) INFORMATION (For Secondary Sales, Gifts, and Voluntary Registration Only)," 3. " (THIS SECTION FOR MARYLAND STATE POLICE USE ONLY)," 4. "GUN INFORMATION (Must Be Completed By *Transferor* )," and signature blocks 5. "*Sign* upon Application or Voluntary Registration" and 6. "*Sign* upon Transfer of Firearm." [Italics added for emphasis].

It is evident that the application, referenced by § 442(b)(3)(i), to purchase or transfer regulated firearms was only designed for permanent "transfers" of such firearms.[10] In fact, the only options available, as indicated at the top of the second page of the application, are for "Dealer Sale," "Secondary Sale," "Gift," and "Voluntary Registration." With the exception of "Voluntary Registration," each option evinces a permanent exchange of title or possession between two individuals. "Voluntary Registration" is indicative of an individual already in possession of a regulated firearm, not of any type of exchange.

Section 442(d)(2) states: "As an alternative to completing a secondary sale of a regulated firearm through a regulated firearms dealer, the prospective seller or transferor and the prospective purchaser or transferee may complete the transaction through a designated law enforcement agency." This section provides an alternative to § 442(d), the pertinent section in the case *sub judice*. The use of "transfer" in § 442(d)(2) distinctly refers to a permanent exchange. This is evident through the introductory language of the section, "As an alternative to completing a secondary *sale* ...." § 442(d)(2) (emphasis added). Transferor (in conjunction with seller) and transferee (in conjunction with purchaser) in this context is concerned with completing a secondary *sale* (permanent exchange) of a regulated firearm through a designated law enforcement agency rather than through a regulated firearms dealer.

Section 443, entitled "Regulated firearm dealer's license," states in subsection (a), that "[n]o person shall engage in the *business* of selling, renting, or *transferring* regulated firearms unless he lawfully possesses and conspicuously displays at his place of business, in addition to any other license required by law, a regulated firearms dealer's license issued by the Secre-

---

**10.** It should also be noted that *Black's Law Dictionary* defines "transferee" as "[o]ne to whom a property interest is conveyed" and "transferor" is defined as "[o]ne who conveys an interest in property." *Id.* at 1536.

tary." (Emphasis added). Again, similar to § 441(f), the use
of "transfer" in the context of a person engaging in the
firearms business provides a connotation of permanent ex-
change of title or possession generally for consideration.

The context in which the term "transfer" is used in the
Regulated Firearms subheading's statutory scheme as a whole
must be harmonized with its use in § 442(d). *Kushell,* 385
Md. at 577, 870 A.2d at 193 (citing *Navarro–Monzo,* 380 Md.
at 204, 844 A.2d at 411; *Deville,* 383 Md. at 223, 858 A.2d at
487). Section 442(d) states, in pertinent part:

"(d) *Sale by other than regulated firearms dealer.*—(1) A
person who is not a regulated firearms dealer may not sell,
rent, *transfer,* or purchase any regulated firearm until after
7 days shall have elapsed from the time an application to
purchase or transfer shall have been executed by the pro-
spective purchaser or transferee, in triplicate, and the origi-
nal copy is forwarded by a regulated firearms dealer to the
Secretary." (Emphasis added.)

The Court of Special Appeals found that "the context in which
'transfer' appears does not comport with the narrow definition
[that of permanent exchange of title or possession] [petitioner]
would have us give the word." *Chow,* 163 Md.App. at 503, 881
A.2d at 1154. The court expounded upon this, stating:

"Section 442(d) refers to three forms of firearm exchange:
'sell [or purchase],' 'rent,' and 'transfer.' 'Rent' is defined in
§ 441(t) as the 'temporary transfer of a regulated firearm
for consideration where the firearm is taken from the
firearm owner's property.' 'Sell' and 'purchase' are not
defined in the subheading, but we assume they carry their
ordinary and popular meaning, and contemplate a perma-
nent transfer for consideration.

" 'Transfer,' then, must contemplate something different
from 'sell' or 'rent'; otherwise, those terms would be sur-
plusage. We strive to 'read statutes so that no word,
clause, sentence or phrase is rendered surplusage, superflu-
ous, meaningless, or nugatory .' " *See State v. Pagano,* 341

Md. 129, 134, 669 A.2d 1339 (1996) (quoting *Montgomery County v. Buckman*, 333 Md. 516, 524, 636 A.2d 448 (1994)). *Chow*, 163 Md.App. at 503, 881 A.2d at 1154–55. We agree with the Court of Special Appeals that "sell" and "purchase" contemplate a permanent exchange for consideration.[11] We have discussed the use of "rent," which is specifically defined in § 441(t). We disagree, however, with the Court of Special Appeals' analysis that "transfer" must be construed with a broad meaning to avoid being considered surplusage. To the contrary, it is when "transfer" is considered in its broad meaning that surplusage language is created. If "transfer" includes everything then the words "sell," "rent" and "purchase" are surplus words.

The Court of Special Appeals' apparent presumption is that a "gift"[12] is the only form that a "permanent exchange of title or possession" can assume. *See Chow*, 163 Md.App. at 504, 881 A.2d at 1155 ("[W]e cannot ascribe to the term, as it is used in § 442(d), a narrow meaning restricted essentially to 'gift'. . . ."). The Court of Special Appeals argues that "transfer" cannot simply mean "gift." The court stated:

"Elsewhere in § 442 itself, the General Assembly used 'gift' to exclude (with certain conditions) those forms of exchange from the prohibitions against straw purchases. *See* § 442(b)(2), (3) (providing that '[t]he prohibitions of this [straw purchase] subsection do not apply to a person purchasing a regulated firearm as a gift,' so long as there is compliance with the application requirement). Had the General Assembly intended to limit its meaning of the verb

---

**11.** *Black's Law Dictionary* defines "sale," the noun form of the word, as: "The *transfer* of property or title for a price." *Id.* at 1364 (emphasis added). "Sell," the verb form of sale, is defined: "To *transfer* (property) by sale." *Id.* at 1391 (emphasis added). "Purchase" is defined: "The act or an instance of buying" and "Purchaser" is defined: "One who obtains property for money or other valuable consideration; a buyer." *Id.* at 1270.

**12.** *Black's Law Dictionary* defines "Gift" as, "[t]he voluntary *transfer* of property to another without compensation." *Id.* at 709 (emphasis added).

'transfer' in § 442(d) to making a gift, we expect that the Legislature would have used that word."

*Chow,* 163 Md.App. at 503–04, 881 A.2d at 1155. We, however, disagree with this reasoning. "Transfer," as defined at the time of the enactment of § 442(d) and read in harmony with the rest of the Regulated Firearms subheading, has the meaning of a *permanent* gratuitous transfer, rather than a temporary transfer. And we will not " 'construe the statute with forced or subtle interpretations that limit or extend its application.' " *Kushell,* 385 Md. at 576–77, 870 A.2d at 193 (quoting *Price,* 378 Md. at 387, 835 A.2d at 1226); *County Council v. Dutcher,* 365 Md. 399, 416–417, 780 A.2d 1137, 1147 (2001). "Transfer" can be ascribed the meaning of "a permanent exchange of title or possession" and not be rendered surplusage, superfluous, meaningless, or nugatory.

Each term in the litany laid out in § 442(d) has its own meaning. The term "sell" contemplates a permanent exchange *for consideration* from a seller or transferor of a regulated firearm to a *buyer.* Conversely, the term "purchase" contemplates a permanent exchange *for consideration* to a buyer or transferee of a regulated firearm from a *seller.* "Rent," as discussed above and defined in § 441(t), contemplates a temporary transfer *for consideration.* None of these words, "sell," purchase," or "rent" can be defined to include the permanent gratuitous transfer of a firearm. That type of *permanent* exchange is covered by the word "transfer" and that is its purpose in the statute, i.e., a *permanent* gratuitous transfer. Read in context with the rest of the Regulated Firearms subheading, the term "transfer," as used in § 442(d), is distinguishable from the words "sell," "rent" and "purchase" in that it means any other *permanent* exchange of title or possession of a firearm even if it is without consideration.[13] This covers situations of permanent exchange that the other

---

13. The Court of Special Appeals suggests that "transfer" has "a broader meaning that includes (even if not limited to) both the permanent exchange of title of the property without consideration (gift), and the temporary exchange of possession without consideration (loan)." *Chow,* 163 Md.App. at 504, 881 A.2d at 1155.

terms fail to address, i.e., in the case of a gift or bequeath-ment. Therefore, "transfer," as used in § 442(d), is not surplusage, superfluous, meaningless, or nugatory. It is the Court of Special Appeals' interpretation that makes the other language of the relevant litany surplusage.

While modern day definitions of "transfer" may, in some instances, attribute to the word a broader meaning, they also provide a more narrow definition. That narrow definition of "permanent exchange of title or possession" is more in harmony with the statutory scheme of the Regulated Firearms subheading, as a whole. Thus, we attribute that narrow meaning to "transfer" as it is used in §§ 442(d) and 449(f).

3. *Even if "Transfer" Can Be Said to Be Ambiguous, the Application of Statutory Construction and a Review of Legislative Intent Reflect that its Meaning in the Context of § 442(d) is One of Permanent Exchange of Title or Possession.*

While we find that "transfer," as used in §§ 442(d) and 449(f), is unambiguous and refers to a *permanent* gratuitous exchange of title or possession, it is useful for confirmatory reasons to look to the purpose of the Regulated Firearms subheading as intended by the General Assembly.[14]

Prior to enacting the predecessor statute to the Regulated Firearms subheading, the General Assembly enacted the Uni-

---

**14.** As stated in *Stanley v. State,* 390 Md. 175, 887 A.2d 1078 (2005):

"We are aware that this Court has reviewed the legislative history of a statute which we have pronounced clear and unambiguous. In those circumstances, that is a confirmatory process, *see [Design Kitchen & Baths v.]Lagos,* 388 Md. 718, 730, 882 A.2d 817, 824 [(2005)]; *State v. Glass,* 386 Md. 401, 411, 872 A.2d 729, 735 (2005); *Mayor and City Council of Baltimore v. Chase,* 360 Md. 121, 128, 756 A.2d 987, 991 (2000) (when the language of the statute is clear and unambiguous, 'the resort to legislative history is a confirmatory process; it is not undertaken to contradict the plain meaning of the statute'); *Coleman v. State,* 281 Md. 538, 546, 380 A.2d 49, 54 (1977) ('a court may not as a general rule surmise a legislative intention contrary to the plain language of a statute or insert exceptions not made by the legislature'), not a contradictory one." *Stanley,* 390 Md. at 185, 887 A.2d at 1084.

form Machine Gun Act. The Uniform Machine Gun Act was initially enacted by the General Assembly in 1933, pursuant to 1933 Md. Laws, Chap. 550 and is now codified in Maryland Code (2002), § 4–403 of the Criminal Law Article. The Uniform Machine Gun Act, utilizes the term "loan" in discussing the registration of machine guns. Section 4–403 states, in pertinent part:

"(a) *Manufacturer registration.*—(1) A manufacturer of a machine gun shall keep a register of each machine gun manufactured or handled by the manufacturer.

(2) The register shall contain:

. . .

(ii) the date of manufacture, sale, *loan*, gift, delivery, and receipt of the machine gun from the manufacturer; and

(iii) the name, address, and occupation of the person to whom the machine gun was sold, *loaned*, given or delivered, or from whom the machine gun was received, and the purpose for which the machine gun was acquired."

(Emphasis added). The original language of the pertinent section has remained largely unchanged over the years:

"Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, *loan*, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, *loaned*, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, *loaned*, given or delivered, or from whom received."

Md.Code (1931, 1935 Supp.), Art. 27, § 350G (emphasis added).

The General Assembly did not enact regulation involving regulated firearms, in respect to handguns, until 1941.[15] The

---

**15.** The Court of Special Appeals provides a partial review of the legislative history of the Regulated Firearms subheading:

Legislature had previously utilized the term "loan" in its regulation of machine guns, arguably a more dangerous instrument than regulated handguns.[16] Had the General Assembly wanted to restrict the exchange of firearms in terms of "loaning" it would have specifically done so in respect to

---

"We have traced the regulated firearms statute back to its origins, and have found that the General Assembly never used the words 'loan' or 'lend' in the statute, and consistently used the word 'transfer.' The General Assembly first regulated the sale of pistols and revolvers in 1941, providing: 'A true record shall be made by each dealer ... of all pistols or revolvers sold, *transferred* or otherwise disposed of at wholesale or retail[.]' 1941 Md. Laws, ch. 622 (emphasis added); Md.Code (1939, 1943 Supp.), Article 27, §§ 531B, 531C.

"In 1957, that language was re-codified at Article 27, § 442, without substantive change. *See* Md.Code (1957), Article 27, § 442. *See generally* 1957 Md. Laws, ch. 23 ('legalizing' the 1957 edition of the Maryland Code).

"In 1966, § 442 was repealed, and re-enacted, with substantial amendments, to change the structure and requirements of the section. 1966 Md. Laws, ch. 502. It was then that the section first resembled the version of § 442 in effect in 2003. *Compare* Md.Code (1957, 1967 Repl.Vol.), Article 27, § 442, *with* Md.Code (1957, 1996 Repl. Vol, 2002 Supp.), Article 27, § 442. The General Assembly continued to use the term 'transfer': '(b) *Application to purchase or transfer.*—No dealer shall sell or *transfer* any pistol or revolver until after seven days shall have elapsed from the time an application to purchase or transfer shall have been executed by the prospective purchaser or transferee....' Md.Code (1957, 1967 Repl.Vol.), Article 27, § 442 (emphasis added).

"As we discuss, *infra*, the language contained in the subsection at issue in this case— § 442(d)—was not added until 1996, as part of the Maryland Gun Violence Act.1996 Md. Laws, chs. 561, 562. The General Assembly used 'transfer' in § 442(d), just as it had been doing in reference to firearms transactions through dealers. *See* Md.Code (1957, 1992 Repl.Vol., 1995 Supp.), Article 27, § 442. Despite amendments to other portions of § 442 between 1996 and 2002, section (d) has remained unchanged."

*Chow*, 163 Md.App. at 505–06 n. 5, 881 A.2d at 1156 n. 5.

**16.** It should be noted that the Uniform Machine Gun Act provides that "[a] person who acquires a machine gun shall register the machine gun with the Secretary of the State Police: (i) *within 24 hours after acquiring the machine gun ....*" Md.Code (2002), § 4–403(c)(1)(i) of the Criminal Law Article (emphasis added). Should we construe "transfer" in § 442(d) with the broad meaning the State requests, we would be making the Uniform Machine Gun Act less onerous (in terms of registration in some instances) than the Regulated Firearms subheading.

situations such as those extant here, and, as is apparent from the machine gun statute, knew how to do so.[17]

---

**17.** The Court of Special Appeals came to the opposite conclusion, stating: "To accept [petitioner's] proposed construction would mean that all regulated firearms could be freely lent by an owner to another person without complying with the strictures of regulation, but machine guns cannot." *Chow*, 163 Md.App. at 506, 881 A.2d at 1156. The Court of Special Appeals' analysis is disingenuous of petitioner's proposed construction. All regulated firearms *can* be lent (on a temporary basis) by an owner to another person that is legally permitted to possess firearms *subject to complying with the strictures of the regulations set out in the Regulated Firearms subheading*. Where a statute dealing with the rights of citizens to possess property, in the context here present, specifically states what is prohibited it can normally be presumed that what is not specifically prohibited—is permitted. Maryland follows the doctrine of *expressio unius est exclusio alterius*. As we stated recently in *Comptroller of Treasury v. Blanton*, 390 Md. 528, 890 A.2d 279 (2006):

"... Maryland has long accepted the doctrine of *expressio (or inclusio) unius est exclusio alterius*, or the expression of one thing is the exclusion of another. Black's Law Dictionary 1717 (8th ed.2004). *Baltimore Harbor v. Ayd*, 365 Md. 366, 385, 780 A.2d 303, 314 (2001) (holding that '[w]e have long applied the principal of statutory construction, *"expressio unius est exclusio alterius"* ....'). *Accord Biggus v. Ford Motor Credit Co.*, 328 Md. 188, 214, 613 A.2d 986, 999 (1992) (stating, '[t]his is in keeping with the familiar maxim of statutory construction that *"expressio unius est exclusio alterius"*—the expression of one thing is the exclusion of another. Maryland has long recognized this basic rule')."

*Blanton*, 390 Md. at 537–38, 890 A.2d at 285.

Section 445 of the Regulated Firearms subheading enumerates restrictions on possession of a regulated firearm in subsection (d):

"(d) *Restrictions on possession—In general.*—A person may not possess a regulated firearm if the person:

(1) Has been convicted of:

(i) A crime of violence;

(ii) Any violation classified as a felony in this State;

(iii) Any violation classified as a misdemeanor in this State that carries a statutory penalty of more than 2 years; or

(iv) Any violation classified as a common law offense where the person received a term of imprisonment of more than 2 years.

(2) Is:

(i) A fugitive from justice;

(ii) A habitual drunkard;

(iii) Addicted to or a habitual user of any controlled dangerous substances;

(iv) Suffering from a mental disorder as defined in § 10–101(f)(2) of the Health–General Article and has a history of violent behavior against another person or self, or has been confined for more than 30

Subsection (d) of § 442 was added in 1996, pursuant to the Maryland Gun Violence Act of 1996 ("Act"). It is instructive to look at some of the documentation surrounding the Act. In 1996, then-Governor Parris N. Glendening proposed two "Administration" bills, cross-filed as Senate Bill 215 and House Bill 297. The Act was "a comprehensive proposal aimed at reducing the epidemic of gun violence" in Maryland. Briefing Statement Before the Senate Judicial Proceeding Committee and the House Judiciary Committee (1996) (statement of Bonnie A. Kirkland, Chief Legislative Officer, Governor's Legislative Office and Colonel David B. Mitchell, Superintendent, Department of State Police), at 2 ("Briefing Statement"). As the Court of Special Appeals points out:

"The Briefing Statement explains: 'To help accomplish this goal, the Maryland Gun Violence Act focuses on reducing the availability of handguns and assault weapons, which are defined in the bill as regulated firearms, to prohibited persons by diminishing the proliferation of illegal sales and transfers of firearms.' *Id.; see also Valentine v. On Target, Inc.*, 353 Md. 544, 564, 727 A.2d 947 (1999) (Raker, J., concurring) (recognizing that the regulated firearms provi-

consecutive days to a facility as defined in § 10–101 of the Health–General Article, unless the person possesses a physician's certification that the person is capable of possessing a regulated firearm without undue danger to the person or to others; or

(v) A respondent against whom a current non ex parte civil protective order has been entered under § 4–506 of the Family Law Article.

(3) Is less than 30 years of age at the time of possession and has been adjudicated delinquent by a juvenile court for committing:

(i) A crime of violence;

(ii) Any violation classified as a felony in this State; or

(iii) Any violation classified as a misdemeanor in this State that carries a statutory penalty of more than 2 years."

In addition, as discussed *supra*, § 445(e) states that "a person who is under 21 years of age may not possess a regulated firearm" unless that minor meets certain exceptions for a "temporary transfer" of the regulated firearm—i.e., with the permission of a legal guardian and under the supervision of an adult legally permitted to possess a regulated firearm or if the minor is participating in marksmanship training while under the supervision of a qualified instructor.

None of these prohibitions would include a person in the status of the transferee in the present case.

sions are part of an 'elaborate statutory scheme [ ] designed to regulate the transfer of handguns[,]' which, like the Omnibus Crime Control and Safe Streets Act passed by Congress in 1968, has the purpose of 'control[ling] and, if possible, eliminat[ing] gun violence')."

*Chow*, 163 Md.App. at 507, 881 A.2d at 1157.  As used in the Briefing Statement its purpose was to reduce the proliferation of *illegal sales* and *illegal transfers*.  The Court of Special Appeals refers to the Briefing Statement's analysis, stating: "Section 442(d) in particular has the purpose of 'disrupt[ing] established gun trafficking patterns by reducing the supply of regulated firearms to the illegal market.'  To read § 442(d) as exempting the loan of a regulated firearm would undermine the laudable purpose of the legislative scheme." *Chow*, 163 Md.App. at 508–09, 881 A.2d at 1158 (citation omitted).  The Briefing Statement, however, in no way alludes to the imposition of restrictions upon the temporary exchange or loan of regulated firearms between two adults that are not legally prohibited from possessing such firearms.

The particular section from which the quote is taken in the Briefing Statement is more properly read when placed in its entire context.  The paragraph reads:

### Key features of Senate Bill 215 and House Bill 297

. . .

II.  Requires *sales* between individuals to go through the same scrutiny as initial purchases from a gun dealer: a background check and a seven-day waiting period. (Article 27 Sec. 442E).  The required application/registration of *secondary sales* coupled with the prohibition of multiple *purchase* transactions will disrupt established gun trafficking patterns by reducing the supply of regulated firearms to the illegal market."

Briefing Statement, at 5 [emphasis added].  The purpose of the legislative scheme is to regulate *sales*, secondary *sales*, and to prohibit multiple permanent *purchase* transactions of regulated firearms in order to disrupt gun trafficking in the

illegal market, not temporary exchanges or loans of regulated firearms between adults legally permitted to possess regulated firearms.

In fact, the Briefing Statement enumerates what the Act proposes to regulate: "Among other things, the Act proposes to limit the *purchase* of regulated firearms to one in a thirty-day period; treat *secondary sales* of firearms like *sales* by dealers; prohibit straw *purchases*; and require a license to *purchase* a regulated firearm." Briefing Statement, at 2 [emphasis added]. In addition, the Briefing Statement's Conclusion states:

"Maryland residents throughout the state favor stricter handgun regulation. These citizens, and those testifying in support of this Legislation, represent a broad array of people throughout the State. Supporters include members of the medical, business and religious community. Supporters also include the increasing number of victims whose lives have been shattered by gun violence, as well as their family and friends. Even many of those traditionally thought to be opposed to any gun control measures, such as gun owners and enthusiasts, support this legislation. *They understand that this Act imposes no restrictions on the use of firearms for lawful purposes such as hunting and sport shooting, and imposes reasonable regulations aimed at reducing the gun violence epidemic by reducing the availability of guns to minors and criminals.*"

Briefing Statement, at 6 [emphasis added]. This is exactly what the Act and § 442(d) do if "transfer" is construed narrowly to mean "a permanent exchange of title or possession." If we, however, adopt the broad meaning that the State requests and the Court of Special Appeals adopted, then the Act and § 442(d) would be interpreted to impose additional restrictions upon the use of firearms for lawful purposes.[18]

---

**18.** Under the State's interpretation, any temporary exchange or loan of a regulated firearm would constitute a violation of § 442(d). For example, if an individual properly owned two regulated firearms and wanted to take a friend who also was permitted to own firearms to the shooting

Our review of the legislative intent suggests that this was not the intent of the Legislature. Furthermore, a look at the Fiscal Note to House Bill 297 (both the original and revised versions) suggests the scope of the bill. The Fiscal Note, in discussing state expenditures, states, "Under current law, only a transaction involving a licensed gun dealer is subject to a waiting period and approval by the State Police. This bill extends that requirement to *sales* between individuals." Fiscal Note, at 2 [emphasis added].

Upon review of the legislative intent involving § 442(d) we find that "transfer," in the context of the statute, is properly defined as a "permanent exchange of title or possession" without consideration.

Pursuant to our determination of the contextual meaning of "transfer" in § 442(d), we hold that "transfer" does not apply to the temporary exchange or loan of a regulated firearm between two adult individuals, without consideration passing between them, who are otherwise permitted to own, obtain, possess, and use a regulated firearm. We give due regard to the Circuit Court's fact finding in the case *sub judice* that the exchange in question was temporary in nature, as in a loan. The Circuit Court stated that it found "that based upon the facts that it was a *temporary* transfer." [Emphasis added]. In addition, "*It [was] the [Circuit] Court's assessment of the testimony of the State's witness that it was in fact a loan* ...." [Emphasis added]. The trial judge stated: "I'll leave it to the higher courts to tell me that a temporary transfer is not

---

range in order to take some target practice, should that person hand their friend one of the firearms to use during the target practice, they would have violated § 442(d). If a spouse has a properly registered hand gun that is kept in the house for protection and permits the other spouse to use it to protect herself from a burglar/assailant, under the State's interpretation, a crime is committed by both spouses—they become misdemeanants. This type of scenario can be repeated in numerous situations in which regulated firearms may be lawfully used. It would be unreasonable to require people to fill out an application, which, as discussed *supra*, doesn't even encompass such temporary exchanges, in triplicate, and then wait 7 days before being able to engage in the lawful use of a regulated firearm, i.e., wait seven days to confront the burglar in one's own house.

a transfer under the law. *I believe under the facts and circumstances of this case it is in fact a temporary transfer."* [Emphasis added].

As discussed *supra*, a *temporary* gratuitous [19] exchange of a regulated firearm between persons legally permitted to possess firearms is not the type of "transfer" contemplated by the framers of § 442(d). Petitioner did not violate the provisions of the Regulated Firearms subheading, in particular § 442(d).

### B. The Requisite *Mens Rea* Required by § 449(f).

■ Maryland Code (1957, 1996 Repl.Vol., 2002 Supp.), Art. 27, § 449(f) states:

"(f) *Knowing participants in sale, rental, etc.*—Except as otherwise provided in this section, any dealer or person who *knowingly* participates in the illegal sale, rental, transfer, purchase, possession, or receipt of a regulated firearm in violation of this subheading shall be guilty of a misdemeanor and upon conviction shall be fined not more than $10,000 or imprisoned for not more than 5 years or both. Each violation shall be considered a separate offense." (Emphasis added.)

The State argues that, pursuant to § 449(f), a violation of § 442(d) requires only the general intent to knowingly and intentionally transfer a regulated firearm. The petitioner argues that the term "knowingly" in § 449(f) establishes a *mens rea* equivalent to specific intent.

■ Every crime is generally composed of two aspects; the *actus reus* (guilty act) and the *mens rea* (culpable mental state) accompanying a forbidden act. *Harris v. State,* 353 Md. 596, 600, 728 A.2d 180, 182–83 (1999); *Garnett v. State,* 332 Md. 571, 577–78, 632 A.2d 797, 800 (1993). "The requirement that an accused have acted with a culpable mental state is an axiom of criminal jurisprudence." [20] *Garnett,* 332 Md. at 578,

---

**19.** If a monetary charge was made, then it would be a rental of a handgun and that *is* expressly regulated by the statute.

**20.** Justice Jackson, writing for the Supreme Court of the United States, stated:

632 A.2d at 800. Maryland continues to recognize the distinction between general and specific intent crimes. *Harris,* 353 Md. at 602, 728 A.2d at 183; *Shell v. State,* 307 Md. 46, 65, 512 A.2d 358, 366–67 (1986).

We discussed specific intent in *Harris,* stating:

"Specific intent has been defined as not simply the intent to do an immediate act, but the 'additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result.' *Shell,* 307 Md. at 63, 512 A.2d at 366 (quoting *Smith v. State,* 41 Md.App. 277, 305, 398 A.2d 426, 443 (1979)); *see also In re Taka C.,* 331 Md. 80, 84, 626 A.2d 366, 368–69 (1993); *Ford v. State,* 330 Md. 682, 702, 625 A.2d 984, 993 (1993); *State v. Gover,* 267 Md. 602, 606, 298 A.2d 378, 381 (1973). In *Shell,* we quoted with approval the explanation of specific intent by Judge Moylan, writing for the Court of Special Appeals in *Smith v. State,* 41 Md.App. at 305–06, 398 A.2d at 442–43:

A specific intent is not simply the intent to do the immediate act but embraces the requirement that the mind be conscious of a more remote purpose or design which shall eventuate from the doing of the immediate act. Though assault implies only the general intent to strike the blow, assault with intent to murder, rob, rape, or maim requires a fully formed and conscious purpose that those further consequences shall flow from the doing of the immediate act. To break and enter requires a

---

"The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.

. . .

"Crime as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand, was congenial to an intense individualism and took deep and early root in American soil."

*Morissette v. United States,* 342 U.S. 246, 250–52, 72 S.Ct. 240, 243–44, 96 L.Ed. 288 (1952) (footnotes omitted); *Garnett,* 332 Md. at 578, 632 A.2d at 800.

mere general intent but to commit burglary requires the additional specific intent of committing a felony after the entry has been made. A trespassory taking requires a mere general intent but larceny (or robbery) requires the specific *animus furandi* or deliberate purpose of depriving the owner permanently of the stolen goods. *This is why even voluntary intoxication may negate a specific intent though it will not negate a mere general intent.*

❊    ❊    *    *    *    ❊

The larger class 'specific intent' includes such other members as 1) assault with intent to murder, 2) assault with intent to rape, 3) assault with intent to rob, 4) assault with intent to maim, 5) burglary, 6) larceny, 7) robbery and 8) the specific-intent-to-inflict-grievous-bodily-harm variety of murder.[21] Each of these requires not simply the general intent to do the immediate act with no particular, clear or undifferentiated end in mind, but the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result.

307 Md. at 62–63, 512 A.2d at 366 (emphasis added). Chief Justice Traynor, writing for the Supreme Court of California, explained the difference between specific intent and general intent crimes:

When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent.

---

**21.** "Although the common law crimes of assault with intent to murder, rob, rape or maim, and burglary have been changed by statute, *see* Art. 27, §§ 12–12A–7 and Art. 27, §§ 28–35B, the analysis remains unchanged...." *Harris,* 353 Md. at 604 n. 2, 728 A.2d at 183 n. 2.

*People v. Hood,* 1 Cal.3d 444, 82 Cal.Rptr. 618, 462 P.2d 370, 378 (1969)."

*Harris,* 353 Md. at 603–04, 728 A.2d at 183–84.

The Court of Special Appeals found that "it is plain that, in the context of the phrase 'knowingly participates in the violation' of § 442(d), 'knowingly' simply means that it must be shown that the defendant had knowledge of the facts that constitute the offense." *Chow,* 163 Md.App. at 511, 881 A.2d at 1159; *see* Wayne R. LaFave, Substantive Criminal Law § 5.2(b) (2d ed.2003) (for the proposition that such meaning is generally attributed to "knowingly" when used in this context in criminal statutes).

In support of that conclusion, the court first looked to definitions of "knowingly" elsewhere in the Maryland Code, specifically in the Criminal Law Article:

"This meaning of 'knowingly,' moreover, comports with that given the same term elsewhere in the Criminal Law Article of the Maryland Code. *See, e.g.,* Md.Code (2002), § 11–201(c) of the Criminal Law Article ('CL') (defining 'knowingly' as meaning 'having knowledge of the character and content of the matter'); CL § 7–102(b) (defining knowing conduct in the theft statute, and stating that '[a] person acts knowingly[,]' *inter alia,* 'with respect to conduct or a circumstance as described by a statute that defines a crime, when the person is aware of the conduct or that the circumstance exists . . . .)' ".

*Chow,* 163 Md.App. at 511, 881 A.2d at 1159. The court then referred to two Supreme Court cases: *Bryan v. United States,* 524 U.S. 184, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) and *United States v. Bailey,* 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), relying heavily on the Supreme Court's reasoning in *Bryan.*

As discussed by the Court of Special Appeals, in its opinion below, in *Bryan:*

"the Court was presented with the task of construing what is meant by the term 'willfully,' in the section that sets forth the penalty for violating certain provisions of the Firearms

Owners' Protection Act. *Id.* at 186–89[, 118 S.Ct. at 1942–44, 141 L.Ed.2d at 197]. *See generally* 18 U.S.C. § 924(a)(1)(D). That act, incidentally, was enacted in part 'to protect law-abiding citizens with respect to the acquisition, possession, or use of firearms for lawful purposes.' *Bryan,* 524 U.S. at 187[, 118 S.Ct. at 1943, 141 L.Ed.2d at 197]. By the act, Congress amended certain provisions of the Omnibus Crime Control and Safe Streets Act of 1968 to 'add a scienter requirement as a condition to the imposition of penalties for most of the unlawful acts defined in § 922.' *Id.* at 187–88[, 118 S.Ct. at 1943, 141 L.Ed.2d at 197]. Congress enacted, *inter alia,* § 924(a)(1), which at the time provided:

> Except as otherwise provided in this subsection, subsection (b), (c), or (f) of this section, or in section 929, whoever—
>
> (A) *knowingly* makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter;
>
> (B) *knowingly* violates subsection (a)(4), (f), (k), (r), (v), or (w) of section 922;
>
> (C) *knowingly* imports or brings into the United States or any possession thereof any firearm or ammunition in violation of section 922(*l* ); or
>
> (D) *willfully* violates any other provision of this chapter,
>
> shall be fined under this title, imprisoned not more than five years, or both.

*Bryan,* 524 U.S. at 187, 188–89 n. 6[, 118 S.Ct. at 1942–44 n. 6, 141 L.Ed.2d at 197] (quoting 18 U.S.C. § 924(a)(1)) (emphasis added)."

*Chow,* 163 Md.App. at 511–12, 881 A.2d at 1159–60.

The *Bryan* Court held that "in order to establish a 'willful' violation of a statute, 'the Government must prove that the

defendant acted with knowledge that his conduct was unlawful.' " 524 U.S. at 191–92, 118 S.Ct. at 1945, 141 L.Ed.2d 197 (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137, 114 S.Ct. 655, 657, 126 L.Ed.2d 615 (1994)). Bryan argued that "willfully" when construed in contrast to "knowingly," as the terms are used within 18 U.S.C. § 924(a)(1), required a more particularized showing than simply showing that he acted with knowledge that his conduct was unlawful. *Id.* at 192, 118 S.Ct. 1939 524 U.S. 184, 118 S.Ct. at 1945, 141 L.Ed.2d 197.

The Court found this argument to be unpersuasive because in that particular context "the term 'knowingly' does not necessarily have any reference to a culpable state of mind or to knowledge of the law. As Justice Jackson correctly observed, 'the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law.' " *Bryan*, 524 U.S. at 192, 118 S.Ct. at 1945, 141 L.Ed.2d 197 (footnote omitted) (quoting *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 345, 72 S.Ct. 329, 333, 96 L.Ed. 367 (1952) (Jackson, J., dissenting)); *see also Staples v. United States*, 511 U.S. 600, 602, 114 S.Ct. 1793, 1795, 128 L.Ed.2d 608 (1994) (holding that a charge that the defendant's possession of an unregistered machinegun was unlawful required proof "that he knew the weapon he possessed had the characteristics that brought it within the statutory definition of a machinegun"); *United States v. Bailey*, 444 U.S. 394, 408, 100 S.Ct. 624, 634, 62 L.Ed.2d 575 (1980) (holding that the prosecution fulfills its burden of proving a knowing violation of the escape statute "if it demonstrates that an escapee knew his actions would result in his leaving physical confinement without permission"). The Court, however, concluded: "Thus, *unless the text of the statute dictates a different result*,[22] the

---

**22.** *"Liparota v. United States*, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985), was such a case. We there concluded that both the term 'knowing' in 7 U.S.C. § 2024(c) and the term 'knowingly' in § 2024(b)(1) literally referred to knowledge of the law as well as knowledge of the relevant facts. See *id.,* at 428–430, 105 S.Ct. at 2089–2091." *Bryan*, 524 U.S. at 193 n. 15, 118 S.Ct. at 1946 n. 15, 141 L.Ed.2d 197.

term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense." *Bryan*, 524 U.S. at 193, 118 S.Ct. at 1946, 141 L.Ed.2d 197 (emphasis added).

In *Liparota v. United States*, 471 U.S. 419, 420, 105 S.Ct. 2084, 2085, 85 L.Ed.2d 434 (1985), the Court reviewed a "statute governing food stamp fraud [which] provide[d] that 'whoever *knowingly* uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not authorized by [the statute] or the regulations' is subject to a fine and imprisonment." (Emphasis added). The statute here states "knowingly participates in the illegal sale ... in violation of this subheading ...." § 449(f). In *Liparota* the Court addressed whether a violation of the statute required that the defendant knew he was acting in a manner *not authorized by the statute*. *Id.* at 420–21, 471 U.S. 419, 105 S.Ct. at 2085–86, 85 L.Ed.2d 434. The Court found: "[a]bsent indication of contrary purpose in the language or legislative history of the statute, we believe that [the statute] requires a showing that the defendant knew his conduct to be unauthorized by statute or regulations." *Id.* at 425, 471 U.S. 419, 105 S.Ct. at 2088, 85 L.Ed.2d 434 (footnote omitted).

We hold that, similarly to *Liparota*, the text of the statute in the case *sub judice*, § 449, dictates a different result from that of *Bryan*. Section 449, in its entirety, states:

" § 449.  **Penalties.**

(a) *Penalties generally.*—Any person who violates any of the provisions of § 445(c) of this subheading is guilty of a misdemeanor and upon conviction shall be fined not more that $1,000 or imprisoned for not more than 1 year or both.

(b) *False information or material misstatement on application.*—Any person who *knowingly* gives any false information or makes any material misstatement in an application to purchase a regulated firearm or an application for a regulated firearms dealer's license shall be guilty of a misdemeanor and upon conviction be fined not more than $5,000 or imprisoned for not more than 3 years, or both.

(c) *Violation of 30-day purchase period.*—Any person who violates any of the provisions of § 442A of this subheading is guilty of a misdemeanor and shall upon conviction be fined not more than $5,000 or imprisoned for not more than 3 years or both.

(d) *Knowing participants in straw purchase or trafficking.*—Any person or dealer who is a *knowing* participant in a straw purchase of a regulated firearm to a prohibited person or to a minor, or transports regulated firearms into this State for the purpose of illegal sale or trafficking of a regulated firearm shall be guilty of a misdemeanor and upon conviction be fined not more than $25,000 or imprisoned for not more than 10 years, or both. Each violation shall be considered a separate offense.

(e) *Illegal possession of firearm with certain previous convictions.*—A person who was previously convicted of a crime of violence as defined in § 441(e) of this article or convicted of a violation of §§ 5–602 through 5–609 or §§ 5–612 through 5–614 of the Criminal Law Article, and who is in illegal possession of a firearm as defined in § 445(d)(1)(i) and (ii) of this article, is guilty of a felony and upon conviction shall be imprisoned for not less than 5 years, no part of which may be suspended and the person may not be eligible for parole. Each violation shall be considered a separate offense.

(f) *Knowing participants in sale, rental, etc.*—Except as otherwise provided in this section, any dealer or person who *knowingly*[23] participates in the illegal sale, rental, transfer, purchase, possession, or receipt of a regulated firearm in violation of this subheading shall be guilty of a misdemeanor and upon conviction shall be fined not more than $10,000 or imprisoned for not more than 5 years, or both. Each violation shall be considered a separate offense." (Emphasis added.)

---

23. The use of the word "knowingly" in this subsection is identical to the meaning attached to the word in the context of *Liparota.*

Subsections (a), (c) and (e) of § 449 do not specify any type of *mens rea* in enumerating the penalties for violations of § 445(c), § 442A and § 445(d)(1)(i) and (ii). In contrast, subsections (b), (d) and (f) of § 449 specifically include the terms "knowingly" or "knowing." The sale of handguns is not itself illegal. It is the manner of the sale or rental, etc., that may make it illegal. The phrase used here "knowingly participates in the illegal sale ..." contemplates that the actor must know that he or she is committing an "illegal sale." We find this to be indicative of a *mens rea* requirement of specific intent for violations of § 449(f).

As commented upon above, § 449 is further distinguishable from the statute addressed in *Bryan*. There are two types of contrasting provisions in § 449; subsections with no specific *mens rea* mentioned and those subsections with "knowingly" included in the language. The subsections that include "knowingly," in particular § 449(f), provide a greater *mens rea* requirement than the subsections that do not mention *mens rea*. While the Supreme Court may have concluded in *Bryan* that, in some instances, "the term 'knowingly' does not necessarily have any reference to a culpable state of mind or to knowledge of the law," our interpretation of § 449(f) comports more with the Supreme Court's finding in *Liparota*. Though the *Bryan* Court decision is more recent than *Liparota*, it specifically provided an exception for such circumstances, specifically not overruling *Liparota's* holding. *Bryan*, 524 U.S. at 193 n. 15, 118 S.Ct. at 1946 n. 15, 141 L.Ed.2d 197 (stating that "unless the text of the statute dictates a different result" and footnoting *Liparota* as an example). Therefore, we find that a violation of § 442(d) and imposition of a penalty under § 449(f) requires that one have a specific intent and requires that a defendant "knows" that the sale, rental, transfer, purchase, possession, or receipt of a regulated firearm of which they are a participant in is in a manner that is illegal and not a legal sale.

Even if it were the case that the *mens rea* element of § 449(f), as indicated by "knowingly," could be construed to be ambiguous, pursuant to the rule of lenity, the statute must

normally be construed in favor of the defendant. In *Melton v. State,* 379 Md. 471, 842 A.2d 743 (2004), we stated:

"In discussing what the rule of lenity requires . . . , this Court has stated that:

'an enhanced penalty statute, is highly penal and must be strictly construed so that the defendant is only subject to punishment contemplated by the statute. When doubt exists regarding the punishment imposed by a statute, the rule of lenity instructs that a court

not interpret a . . . criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the legislature] intended.' "

*Melgar v. State,* 355 Md. 339, 347, 734 A.2d 712, 716–17 (1999) (quoting *White v. State,* 318 Md. 740, 744, 569 A.2d 1271, 1273 (1990)) (citations omitted). *See also Webster v. State,* 359 Md. 465, 481, 754 A.2d 1004, 1012 (2000) (stating that " 'ambiguity in a criminal penal statute, in accordance with the rule of lenity, ordinarily is to be construed against the State and in favor of the defendant'); *McGrath v. State,* 356 Md. 20, 25, 736 A.2d 1067, 1069 (1999)."

*Melton,* 379 Md. at 489, 842 A.2d at 753. A person in violation of § 449(f) is guilty of a misdemeanor and upon conviction can be fined up to $10,000 or imprisoned for up to 5 years, or both. If there is any ambiguity in respect to the *mens rea* element of the statute, in accordance with the rule of lenity, the statute must be construed against the State and in favor of the defendant.

## IV. Conclusion

■ We find that the temporary gratuitous exchange or loan of a regulated handgun between two adult individuals, who are otherwise permitted to own and obtain a regulated handgun, does not constitute an illegal "transfer" of a firearm in violation of Maryland Code (1957, 1996 Repl.Vol., 2002 Supp.), Art. 27, § 442, in particular, subsection (d). The plain language of § 442(d), when construed in harmony with the

rest of the subheading, reveals that "transfer" can only refer to a *permanent* exchange of title or possession and does not include gratuitous temporary exchanges or loans. Legislative history further supports our interpretation. We also conclude that the inclusion of the term "knowingly" in § 449(f) creates a specific intent *mens rea* for violations of that subsection. Thus, in order to be in violation of § 449(f), a person must know that the activity they are engaging in is illegal. This ruling does not place any undue burden on the State. "Rather, as in any other criminal prosecution requiring *mens rea,* the [State] may prove by reference to facts and circumstances surrounding the case that [the defendant] knew that his conduct was unauthorized or illegal." *Liparota,* 471 U.S. at 434, 105 S.Ct. at 2092–93, 85 L.Ed.2d 434 (footnote omitted).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT.**

Dissenting WILNER, J., which Raker and BATTAGLIA, JJ., join.

With respect, I dissent from the result reached by the Court because, on the facts of this case, I believe that there was a transfer of the gun from Chow to Nguyen in clear violation of what is now § 5–124 of the Public Safety Article (PS). I would therefore affirm the judgment of the Court of Special Appeals.

The Court defines the word "transfer" as requiring a permanent exchange of title or possession of the firearm, but that would render the term essentially meaningless, and we do not read statutes, especially regulatory statutes of this kind, to render terms deliberately used by the Legislature meaningless. The Court goes through an analysis of dictionary definitions in an effort to determine what "transfer" means. Such definitions are often helpful, because words used in a statute are ordinarily given their plain meaning, but the ultimate issue

is not how the lexicographers define the word but what the Legislature intended to achieve.

The provision in question was added to the law as part of what the Legislature called the Maryland Gun Violence Act of 1996, which was a comprehensive law designed to place additional limits on the trafficking in regulated firearms. Prior to that law, a *dealer,* who was then defined as a person engaged in the business of "selling" or "repairing" firearms, was not permitted to "sell or transfer" a regulated firearm until seven days had elapsed from the time an application to "purchase or transfer" the weapon was filed by the prospective "purchaser or transferee" with the Secretary of State Police. *See* former Md.Code, art. 27, §§ 441, 442 (1987 Repl.Vol. and 1995 Supp.).

The purpose of the waiting period was, and remains, to give the Secretary an opportunity to make an investigation and determine whether the prospective transferee is eligible to own and possess the weapon. *See* former § 442; current PS §§ 5–121, 5–122. Although the former law spoke in terms of the dealer not selling or transferring the firearm until the waiting period expires, (and the current law speaks in terms of the dealer not selling, renting, or transferring the firearm until that period has expired), both laws obviously were intended to preclude any actual *delivery* of the firearm until that time. *See* current PS § 5–123(b), (c), and (d), requiring the dealer to "complete" the sale, rental, or transfer within 90 days after notice that the application was not disapproved and to notify the Secretary of the completed transaction within seven days after "delivery" of the firearm; *also* former § 442(j). Read in a sensible way, the law prohibited a dealer from delivering a regulated firearm to another person, pursuant to a sale or transfer agreement (and currently a rental agreement as well), until the expiration of the waiting period.

In limiting the waiting period to transactions with licensed dealers, the former law contained an obvious and enormous loophole. Totally unregulated were secondary transactions, in which any person, other than a dealer, who happened to be in possession of a regulated firearm could transfer it to someone

else, including a person not legally eligible to own or possess the weapon. The 1996 law clearly was intended to close that loophole. Not only did the 1996 law (current PS § 5–123) preclude dealers from renting firearms prior to the expiration of the waiting period but, more significantly, in what is now PS § 5–124, captioned "Secondary Transactions,"it applied the same seven-day waiting period applicable to dealers to sales, rentals, and transfers by persons who are not dealers. That was certainly a major and important extension of the effort to control the trafficking in these weapons.

The terms "sell" and "rent" have a fairly clear and restrictive meaning. The term "transfer" is obviously a broader term, meaning something beyond a sale or rental; otherwise, there would have been no reason for the General Assembly to place and leave it in the statute. The Court seems to accept that "transfer" would include a gift, at least a permanent gift. The real question is whether it includes a loan. Keeping in mind that the prohibition against transferring a firearm until expiration of the waiting period applies to both dealers and non-dealers, I cannot imagine that the Legislature, in its effort to *close* a loophole, intended to open one even larger than the one it closed, by allowing *both dealers and non-dealers* to *lend* regulated firearms to persons without complying with the seven-day waiting period, but that is precisely what the Court seems to be saying. Does the Court really mean to hold that a dealer and a non-dealer, through the fiction of a loan, can lawfully deliver possession and control of a regulated firearm to a person without regard to the waiting period? *If so, the Court will have absolutely eviscerated the law, at least with respect to secondary transfers, and to what end—for what purpose?*

I would hold that "transfer" includes a loan—at least one in which possession and control of the firearm is relinquished for anything more than a momentary period. Like all statutory language, the word should be given a reasonable meaning. I agree with the Court that the Legislature did not intend the word "transfer" to prohibit a firearm owner from allowing a prospective purchaser, lessee, or transferee to test fire the

weapon before deciding whether to purchase, rent, or otherwise acquire possession or control of it, any more than it would prevent the owner from allowing the prospective customer to hold and examine the weapon in the owner's presence. Nor would it prohibit an owner from allowing another competent person, at a firing range, to shoot the weapon in the presence of the owner. Those kinds of circumstances do not constitute a transfer of the weapon; to give that kind of expansive meaning to the term would be wholly unreasonable and would extend the term well beyond what could possibly have been intended.

But that is *not* what occurred in this case. If the original objective of the parties had been implemented—test firing of the weapon at a range to see if Nguyen was truly interested in buying it—there would have been no violation of the statute. When Chow allowed Nguyen to retain the gun in his exclusive possession and control for some indefinite time, however, there *was* a transfer—an unlawful one.

Judge RAKER and Judge BATTAGLIA have authorized me to state that they join in this dissent.