*George M. Hayden v. Maryland Department of Natural Resources*, No. 2434, September Term 2017

Opinion by Kehoe, J.

**STATUTORY INTERPRETATION – NATURAL RESOURCES LAW**

Section 4-1210 of the Natural Resources Article of the Maryland Code requires the Department of Natural Resources to revoke an individual's authorization to engage in commercial oyster harvesting activities if an administrative law judge concludes after a hearing that the individual violated one or more of five enumerated offenses listed in subsection (a)(2) of that statute.

In order to revoke the person's authorization to engage in oystering activities, the administrative law judge must find that that the person "knowingly" committed one of the enumerated offenses in § 4-1210(a)(2). For purposes of the statute, "knowingly" means "intentionally" or "deliberately." Thus, in order to revoke a person's authorization to engage in commercial oyster activity, the Department must demonstrate that the person intentionally or deliberately committed one of the offenses enumerated in subsection (a)(2). There is no requirement that the Department demonstrate that the person knew his or her activities were in violation of the law.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2434

September Term, 2017

_____

GEORGE M. HAYDEN

v.

MARYLAND DEPARTMENT OF
NATURAL RESOURCES

_____

Wright,
Kehoe,
Leahy,

JJ.

_____

Opinion by Kehoe, J.

_____

Filed: September 3, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Maryland has regulated the harvesting of oysters in the Chesapeake Bay and its tributaries since 1868. The era when the law was enforced by Maryland's "Oyster Navy"—ships armed with cannon and, later, machine guns, and crewed by men more than willing to use them—has passed.[1] Nonetheless, the State's regulations are strict and the sanctions for violations can be severe.

In this appeal from a judgment of the Circuit Court for St. Mary's County, George M. Hayden challenges a decision of an administrative law judge that permanently revoked his ability to harvest oysters in Maryland's tidal waters. The administrative law judge did so pursuant to Md. Code § 4-1210 of the Natural Resources Article, which requires the Maryland Department of Natural Resources to revoke an individual's authorization to conduct commercial oyster harvesting if an administrative law judge finds that the individual "knowingly" violated any of the five offenses enumerated in the statute. He raises two issues, which we have reworded:

1. In a revocation of authorization action brought pursuant to Nat. Res. § 4-1210, is the Department required to prove that the licensee knew that he or she was violating the law when committing the predicate offense?

---

[1] The tumultuous and often violent story of Maryland's early efforts to regulate its oyster industry is told in John R. Wennersten, OYSTER WARS OF CHESAPEAKE BAY (1981). Some of the legal aspects of this history are analyzed in Garrett Power, *More About Oysters Than You Wanted To Know*, 30 MD. L. REV. 199, 202–10 (1970). Professors Wennersten and Powers are emeriti professors at, respectively, the University of Maryland and the University of Maryland Francis King Carey School of Law.

An informative perspective on the challenges faced by prosecutors, defense attorneys, and judges in criminal cases arising out of violations of Maryland's oyster laws may be found in Joyce R. Lombardi, *Modern Oyster Wars: Off the Water and Into Court*, 47 MD. BAR JOURNAL 50 (March-April 2014).

2. Was the administrative law judge's finding that Mr. Hayden "willfully disregarded and failed to learn the laws and requirements of oyster harvesting" supported by substantial evidence?

Because our answer is "no" to the first question, and "yes" to the second, we will affirm the decision of the administrative law judge.

**Background**

A Regulatory Overview

The Department of Natural Resources (the "Department") regulates and enforces Maryland's fishing laws, which includes the authority to grant or deny tidal fish licenses. A tidal fish license authorizes the licensee "to guide fishing parties, catch fish for commercial purposes and buy, sell, process, transport, export or otherwise deal in fish which were caught in the tidal waters of Maryland." Nat. Res. § 4-101(r). In the statutory scheme, the meaning of the word "fish" is very broad: it includes finfish, *e.g.* striped bass a/k/a rockfish, blue fish, perch, etc.; crustaceans, *e.g.*, blue crabs; and mollusks, *e.g.*, oysters and clams. Nat. Res. § 4-101(j). Tidal fish licenses have a term of one year and are renewed on September 1 of each year. Nat. Res. § 4-701(c).

Possession of a tidal fish license does not, by itself, permit a licensee to harvest oysters. In order to engage in the commercial harvesting of oysters, an individual must also pay an annual surcharge of $300 and, what is significant to the issues raised in this appeal, certify to the Department that he or she has received certain publications that we will now describe. Nat. Res. § 4-701(g)(1)(i).

The Department is required by law to prepare maps and coordinates showing the locations of areas that are off-limits to oyster harvesting and to distribute copies of those

- 2 -

maps to licensees on an annual basis. Nat. Res. § 4-1006.2.[2] For their part, licensees must sign a receipt stating that they have received the information. Section 4-1006.2(b)(2) requires the Department to prepare a form by which the licensee acknowledges receipt of the information provided by the Department when a license is renewed. The form in use in 2016, when Mr. Hayden last renewed his license, stated in relevant part:

> I hereby acknowledge my responsibility as a licensed shellfish harvester to know and comply with all laws governing shellfish including harvesting, reporting requirements, and restrictions relating to shellfish harvesting gear.
>
> I hereby certify under penalty of perjury that I have received from the Department of Natural Resources maps and coordinates of . . . areas closed to shellfish harvest by the Department of the Environment[.]

There is another layer of regulations pertaining to oyster harvesting. The Maryland Department of the Environment (the "MDE") administers programs concerning the public health of the Chesapeake Bay. Specifically, the MDE is authorized to close areas of the Chesapeake Bay and its tributaries to oyster harvesting when the MDE determines that those areas are polluted and that the shellfish from the polluted areas are hazardous to

---

[2] Nat. Res. § 4-1006.2 states:

> (a) The Department annually shall publish maps and coordinates of oyster sanctuaries, closed oyster harvest reserve areas, and areas closed to shellfish harvest by the Department of the Environment.
>
> (b)(1) The Department shall provide the publications required under this section to each tidal fish licensee who pays the oyster surcharges required under § 4-701(g) of this title.
>
> (2) Before a person may catch oysters under a tidal fish license that has an oyster authorization and for which the oyster surcharges have been paid, the person shall certify to the Department on a form the Department prescribes that the person received the publications required under this section.

public health. Nat. Res. § 4-742. Harvesting oysters from a closed area is prohibited by statute. Nat. Res. § 4-1006(b)(1). Areas closed by the MDE are designated on the maps prepared annually by the Department and distributed to commercial oyster harvesters pursuant to Nat. Res. § 4-1006.2. In addition, the Department is authorized to promulgate regulations regarding oyster harvesting. The Department has done so, and the regulations are found in Title 8, chapter 4 of the Code of Maryland Regulations ("COMAR").

There is an exception to the rule that an individual cannot remove oysters from a closed area. The Department and the MDE allow individuals to remove oysters from a closed area to a personal aquaculture lease, a process known as "relaying." A term of art, relaying occurs when a person harvests oysters from a polluted area and moves them to a non-polluted area so that the oysters can filter out toxins until they are marketable for sale and consumption. In order to relay oysters, a licensee must obtain a permit to do so from the MDE. Nat. Res. § 4-1006. In order to obtain a relay permit, the applicant must first have: (a) a tidal wetlands license for both the harvesting and relay sites, (b) a water column lease from the Board of Public Works, (c) an aquaculture permit from the Department, and (d) a shellstock shippers license from the Maryland Department of Health and Mental Hygiene.[3] Additionally, the MDE allows relaying only when the oyster season is closed, and relaying must be conducted under the supervision of a Department of Natural Resources Police officer. A relay permit is good only for the one relaying activity, and cannot be used for

_____

[3] Pursuant to Md. Rule 5-201, we take judicial notice of the MDE's rules relating to relay permits. *See* https://perma.cc/95CJ-JEB4 (last accessed August 20, 2019).

any relaying that occurs at a later date. A relay permit application takes, on average, three to seven days to process, and there is no fee associated with obtaining one.[4]

A person violating any provision of either Title 4 of the Natural Resources Article or a regulation of the Department regarding oyster harvesting may face criminal penalties, including fines and incarceration. *See* Nat. Res. § 4-1201. Additionally, the Department must take administrative action against a person who is charged with violating certain provisions of Title 4. The administrative sanction, which is the subject of this appeal, is found in Nat. Res. § 4-1210, which states in pertinent part:

> (a)(1) In addition to any other penalty or fine provided in this title, a person who holds an authorization to catch oysters under § 4-701 of this title and receives a citation for an offense listed under paragraph (2) of this subsection may have the authorization revoked in accordance with this section.
>
> (2) The following offenses, committed in violation of this title or of any regulation adopted under this title, are grounds for revocation of an authorization to catch oysters under this section:
>
> (i) Taking oysters located more than 200 feet within a closed or prohibited area;
>
> (ii) Taking oysters with gear that is prohibited in that area;
>
> (iii) Taking oysters outside of a time restriction for the harvest of oysters by more than 1 hour;
>
> (iv) Taking oysters during closed seasons; and
>
> (v) Taking oysters from a leased area by a person other than the leaseholder or the leaseholder's designee.
>
> (b)(1)(i) Before the revocation of an authorization to catch oysters under this section, the Department shall hold a hearing on the matter in accordance with

---

[4] *See* note 3, *supra*.

the Administrative Procedure Act under Title 10, Subtitle 2 of the State Government Article.

(2) After a hearing is conducted under paragraph (1) of this subsection, if the presiding officer finds or concludes that the person *knowingly* has committed an offense listed under subsection (a)(2) of this section, the Department shall revoke the person's authorization to catch oysters.

\* \* \*

(Emphasis added).

It is the meaning of the word "knowingly" in subsection (b)(2) that is the primary focus of this appeal.

Facts

Mr. Hayden has been a waterman for over twenty years. In the early morning of February 25, 2017, he began harvesting[5] oysters in Whites Neck Creek, a tributary of the Wicomico River in southern Maryland. He positioned his boat, equipped with a hydraulic dredge,[6] over an oyster bed adjacent to real property owned by his parents. His intended purpose was to relay the oysters from that location, transport them to an area of Saint Catherine's Sound which was subject to his private aquaculture lease from the State, and redeposit them. As it turned out, Mr. Hayden was harvesting oysters about 1,198 feet into

---

[5] "Harvest" means "to take, kill, trap, gather, catch or in any manner reduce any hard-shell clam, soft-shell clam, or oyster to personal possession or to attempt to engage in this conduct." Nat. Res. § 4-1001(k).

[6] A "dredge" is "any dredge, scoop, scrape, or similar device used in catching oysters or claims by dragging." Nat. Res. § 4-1001(f)

- 6 -

an area of the Creek that had been closed to oyster harvesting by the MDE because of pollution. He did not have a permit to relay oysters, nor was relaying permitted on the day in question.

Natural Resources Police Officer Jason Kreider was present on the shore of the Creek with a clear line of sight into the closed area. Officer Kreider witnessed Mr. Hayden pull oysters from the closed area using his hydraulic dredge, haul them into his boat, proceed down Whites Neck Creek, and deposit the oysters in his aquaculture lease site.

When Mr. Hayden returned to the closed area, Officer Kreider signaled for him to come to shore. Mr. Hayden complied, and the two engaged in conversation about Mr. Hayden's activities. Mr. Hayden admitted that he was relaying oysters from Whites Neck Creek to his private aquaculture lease in Saint Catherine's Sound. A few days later, Officer Kreider issued Mr. Hayden three citations for: (1) using a hydraulic dredge to harvest oysters in a non-designated area;[7] (2) harvesting oysters during a closed season;[8] and (3) harvesting oysters from an area closed by the MDE due to pollution.[9]

---

[7] A violation of COMAR 08.02.04.12.

[8] A violation of COMAR 08.02.04.03B(3)(c).

[9] A violation of Nat. Res. § 4-1006(b).

The Administrative Hearing

Although the State did not pursue the criminal charges against Mr. Hayden, the Department, as required by Nat. Res. § 4-1210, sought to revoke Mr. Hayden's authorization to engage in commercial oyster harvesting.

On June 19, 2017, a hearing was held before an administrative law judge. As to the issues relevant in this appeal, the parties made the same arguments at the hearing as they do on appeal. We will discuss those arguments in more detail in our analysis, and so we provide only an abbreviated summary of them here.

The Department's theory of the case was that "knowingly," as used in Nat. Res. § 4-1210(b), means "intentionally" or "deliberately." According to the Department, Mr. Hayden's culpability was abundantly clear under this standard because he admitted to Officer Kreider that he that he had relayed oysters from a closed area, out of season, using a hydraulic dredge. Mr. Hayden approached § 4-1210(b) differently. He took the position that, in order for the administrative law judge to find that he "knowingly" violated the statute, the Department had to prove that Mr. Hayden was subjectively aware that he was violating the law when he removed oysters from the closed area. Operating under this theory, Mr. Hayden asserted that when he relayed oysters from the closed area of Whites Neck Creek, he was not aware that doing so was illegal.

As a preliminary matter, the parties stipulated to the following facts: that on February 25, 2017, Mr. Hayden pulled oysters from a closed area of Whites Neck Creek; that Mr. Hayden was in excess of 1,198 feet inside the closed area; that the area had been closed due to pollution; that Mr. Hayden relayed oysters from the closed area to his private

- 8 -

aquaculture lease; that Mr. Hayden did not have a relay permit; that Mr. Hayden signed a copy of the Oyster Surcharge Sheet on November 9, 2016, acknowledging that he would know and comply with all laws governing shellfish, and certified, under penalty of perjury, that he received the Department's maps and coordinates of oyster sanctuaries and areas closed to shellfish harvesting; and that Mr. Hayden received a copy of the Department's Shellfish Closure Manual dated June 2016.

The Department called Louis C. Wright as its only witness. Mr. Wright has been a hydrographer with the Department for about thirty-five years. As a hydrographer, Mr. Wright surveys areas of the Chesapeake Bay and its tributaries, prepares maps and coordinates of areas closed to oyster harvesting, and drafts textual descriptions of those areas for the use of the Department and the public. He testified that the area from which Mr. Hayden was relaying oysters had been designated as a closed area by the MDE, and clarified that a "closed area" was an area, determined by the MDE through water sampling, to have shellfish contamination, and so closed for shellfish harvesting. However, Mr. Wright noted that an individual could relay oysters from a closed area if he or she obtained a relay permit from the Department.

Mr. Hayden called Jane Louis Hayden, his mother, as a witness in support of his argument that he believed he could relay oysters from the closed area because his parents had a riparian right to harvest oysters in Whites Neck Creek. She testified that her family had owned the property since the 1930s, and read a portion of their deed, which provided that the property included the riparian right to use the bottom of Whites Neck Creek

adjacent to the property from the shoreline to the center of the Creek "for oyster planting and cultivation."

Mr. Hayden also called his wife, Ernestine Hayden, to testify about a conversation she previously had with Mr. Wright. Mrs. Hayden, who works with her husband in their oyster business, testified that she spoke with Mr. Wright in May 2016 while he was surveying a lease that the couple had applied for. She stated that she asked Mr. Wright about needing a lease to oyster the portion of Whites Neck Creek subject to the family's riparian rights. According to Mrs. Hayden, Mr. Wright replied that the Department "probably would like for you to so that they can regulate oysters," but that "as far as I know, technically you do not need a lease there." Mrs. Hayden recorded what Mr. Wright told her on a small piece of paper shortly thereafter, and this note was entered into evidence.[10]

Finally, Mr. Hayden himself testified. First, he testified that he relayed the oysters he had harvested from Whites Neck Creek to the site of his aquaculture lease. Mr. Hayden added that his family had harvested oysters from that area since 1925, and that he hadn't realized the law regarding harvesting oysters from a riparian bed had changed.

Mr. Hayden then testified about the conversations he had had with Kathy Bohan, an MDE employee. Ms. Bohan had previously taken samples from Whites Neck Creek and tested those samples for pollution.[11] Sometime after those samples had been tested but

---

[10] Mr. Wright testified that he did not recall having such a conversation with Mrs. Hayden.

[11] It was the results of those tests that led the Department to close portions of Whites Neck Creek.

before February 25, Mr. Hayden called Ms. Bohan to ask if the water quality of the Creek had improved. When she told Mr. Hayden that it had not, Mr. Hayden asked Ms. Bohan to take new samples from that portion of the closed area adjacent to his parents' property. In doing so, Mr. Hayden hoped that if the MDE could get a better reading, he would gain a "small window" of opportunity to relay oysters from the closed area. When Mr. Hayden indicated to Ms. Bohan that his parents had riparian rights for the area, Ms. Bohan informed him that she thought the law regarding harvesting oysters on riparian land had changed.

Based on what Ms. Bohan told him about the legal change in riparian rights law, Mr. Hayden called Mr. Wright to discuss the matter. According to Mr. Hayden, Mr. Wright told him that he "technically" did not need a lease to harvest oysters from an area subject to his riparian rights.

Mr. Hayden was then cross-examined by counsel for the Department. Mr. Hayden admitted that he relayed oysters from a closed area, that he knew the area was polluted, that he knew that area had been closed due to pollution since the 1990s, that he planned to sell the oysters he took from the closed area after they "filtered out" for several weeks on his personal aquaculture lease, and that an adjoining aquaculture lease area was also closed as a result of his activities.

Mr. Hayden was also cross-examined about the Department's licensing procedures. He testified that he was given a packet of information when his tidal fish license was renewed by the Department in 2016. He signed an acknowledgement that he had received this information. The receipt was entered into evidence. It stated in pertinent part:

> I hereby acknowledge my responsibility as a licensed shellfish harvester to know and comply with all laws governing shellfish including harvesting, reporting requirements, and restrictions relating to shellfish harvesting gear.
>
> I hereby certify under penalty of perjury that I have received from the Department of Natural Resources maps and coordinates of . . . areas closed to shellfish harvest by the Department of the Environment[.]

Mr. Hayden also testified that he had received a copy of the Shellfish Closure Manual, which includes maps of the closed areas of the Chesapeake Bay (including those in Whites Neck Creek), and contained additional information on shellfish closures. However, Mr. Hayden also testified that he read "very poorly" and that the receipt was "hard to understand." He explained that his wife handled the business transactions for their oystering business.

On June 27, 2017, the administrative law judge issued her decision. The administrative law judge revoked Mr. Hayden's authorization to engage in commercial oyster activity under Nat. Res. § 4-1210. The administrative law judge found that the Department had proved by a preponderance of the evidence that Mr. Hayden had taken oysters from a location more than 200 feet within a closed area, which is prohibited by Nat. Res. § 4-1210(a)(2)(i). The administrative law judge concluded as a matter of law that Nat. Res. § 4-1210 does not have a scienter requirement and that, accordingly, Mr. Hayden had violated the statute.

As to the scienter issue, the administrative law judge concluded that "[t]he plain language of [Nat. Res. § 4-1210] demonstrates that the 'knowingly' requirement modifies 'has committed an offense listed under subsection (a)(2).'" By substituting the actual words of the offense into subsection (b)(2), the administrative law judge considered the standard

was: "did the Respondent know [that] he took oysters located more than 200 feet within an area he knew was closed?" Answering that question in the affirmative, the administrative law judge concluded that the Department was required to demonstrate only that Mr. Hayden knew he was taking oysters and that he knew he was in a closed or prohibited area when doing so. The Department met this burden, and Mr. Hayden admitted as much at the administrative hearing.

As an alternative basis for her decision, the administrative law judge concluded that, "even if the law requires that I find that [Mr. Hayden] knew he was breaking the law when he took the oysters," Mr. Hayden "willfully disregarded and failed to learn the laws and requirements of oyster harvesting." The administrative law judge concluded that knowledge of the applicable statutes and regulations was imputed to Mr. Hayden by his receipt of the Department's Shellfish Closure Manual, which he received from the Department when he renewed his authorization to harvest oysters in 2016. The administrative law judge pointed out that this material "clearly explain[ed]" the applicable regulations and restrictions and that "[t]here is nothing in that manual that states there is an exception to any of these requirements for relaying oysters" from an area subject to riparian rights. The administrative law judge concluded:

> The evidence proves that the laws and requirements applicable to shellfish harvesting, and specifically applicable to this case, were placed by the [Department] directly in [Mr. Hayden's] hands. [His] failure to read and digest these laws and requirements is no excuse for violating the requirements. *See Greenway v. State,* 8 Md. App. 194, 197 (1969) (a person may be found to have knowledge when the person deliberately shuts his/her eyes to avoid knowing what would otherwise be obvious to view).

I understand that [Mr. Hayden] is limited in his literacy; however, [he] testified that he never asked anyone to read the applicable laws and/or the Shellfish Closure Area manual to him, despite signing a certification that he understood [that] he was required to know what was contained in those documents.

Additionally, the administrative law judge concluded that Mr. Hayden's riparian rights defense was irrelevant, because, Mr. Hayden's actions were illegal even if he had a riparian right to harvest oysters.

The administrative law judge noted that to conclude otherwise in this case would allow Mr. Hayden "to avoid sanction due to his lack of due diligence," as well as encourage other licensees "to disregard their obligation to learn, know and understand the requirements of their industry so as to avoid sanctions." Further, the administrative law judge emphasized how Mr. Hayden's actions affected others. At the hearing, Mr. Hayden conceded he caused the waters and oysters surrounding his aquaculture lease to become polluted by relaying oysters from a polluted area to his own lease bed.

Mr. Hayden filed a petition for judicial review in the Circuit Court for St. Mary's County. That court upheld the administrative law judge's decision. Mr. Hayden filed a timely appeal to this court.

## The Standard of Review

When reviewing a decision of an administrative agency, we "look through" the circuit court's decision and "evaluate the decision of the agency." *Kor-Ko Ltd. v. Maryland Department of the Environment*, 451 Md. 401, 409 (2017) (internal quotations omitted). "Our primary goal is to determine whether the agency's decision is in accordance with the law or whether it is arbitrary, illegal, and capricious." *Long Green Valley Association v. Prigel Family Creamery*, 206 Md. App. 264, 274 (2012) (quoting *Maryland Department of the Environment v. Ives*, 136 Md. App. 581, 585 (2001)). We conduct a "two-fold inquiry," examining "whether there is substantial evidence in the record to support the agency's findings and conclusions and whether the agency's decision is premised upon an erroneous conclusion of law." *McClellan v. Department of Pub. Safety & Corr. Servs.*, 166 Md. App. 1, 18 (2005). We will uphold the agency's decision as long as it is "not premised upon an error of law and if the agency's conclusions reasonably may be based upon the facts proven." *People's Counsel for Baltimore County v. Loyola College*, 406 Md. 54, 67 (2008) (quoting *Ad + Soil, Inc. v. County Comm'rs of Queen Anne's County*, 307 Md. 307, 338 (1986)). We review *de novo* an agency's conclusions of law. *Christopher v. Montgomery County Department of Health and Human Serv*s., 381 Md. 188, 198 (2004). This includes questions of statutory interpretation. *Md.–Nat'l Capital Park & Planning Comm'n v. Anderson*, 395 Md. 172, 181 (2006); *Wallace H. Campbell & Co. v. Maryland Comm'n on Human Relations*, 202 Md. App. 650, 663 (2011).

**Analysis**

Mr. Hayden argues that, in order for the Department to revoke his commercial oystering authorization, the Department must prove that he knew that he was violating the law when he took oysters located more than 200 feet within a closed area, and did so with equipment that is prohibited in the area. He concedes that his actions did in fact violate the law but asserts that he was unaware of the law's requirements. Phrased differently, Mr. Hayden imputes what he calls a "specific intent" requirement into Nat. Res. § 4–1210(b)(2).[12] He asserts that such an interpretation reflects the plain meaning of the statutory language, is consistent with appellate decisions considering similar language in other statutes, and reflects the legislative history of § 4-1210.

---

[12] In their briefs, both parties refer to "specific intent," but we believe that "scienter" is the more accurate term. Scienter means the "degree of knowledge that makes a person legally responsible for the consequences of his or her act or omission. . . especially as a ground for civil damages or criminal punishment." B. Garner, BLACK'S LAW DICTIONARY 1613 (11th ed. 2019). This is precisely the concept that the parties are arguing about in this case, and this is the term that we have used in this opinion.

"Specific intent" is defined as "the intent to accomplish the precise criminal act that one is later charged with." *Id.* at 965. In *Shell v. State*, the Court of Appeals explained that:

> A specific intent is not simply the intent to do the immediate act but embraces the requirement that the mind be conscious of a more remote purpose or design which shall eventuate from the doing of the immediate act. Though assault implies only the general intent to strike the blow, assault with intent to murder, rob, rape or maim requires a fully formed and conscious purpose that those further consequences shall flow from the doing of the immediate act.

307 Md. 46, 62–63 (1986) (quoting *Smith v. State*, 41 Md. App. 277, 305 (1979)).

To support the plain language part of his argument, Mr. Hayden relies on the definition of "knowingly" in Black's Law Dictionary 784 (5th ed. 1979):

> with knowledge, consciously; intelligently; willfully; or intentionally.
>
> A person acts knowingly with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist, and (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result. Model Penal Code § 2.202.

Mr. Hayden asserts that this dictionary definition establishes that § 4-1210 requires the Department to prove that he consciously and intelligently knew that his conduct was prohibited by law. Based on his interpretation, Mr. Hayden contends that there was "overwhelming" evidence that he "consciously and intelligently thought his actions were allowed under the laws" because (1) his family had oystered the closed area of Whites Neck Creek for over ninety years, and (2) because he was told by Department staff, particularly Mr. Wright, that he was not required to obtain a lease for his parents' riparian land in the Creek.

If there is any ambiguity to "knowingly" in Nat. Res. § 4-1210(b)(2), Mr. Hayden asserts that the legislative history of the statute as well as case law on the issue are dispositive. Mr. Hayden argues that had the legislature intended "to create a strict liability statute" when it enacted Nat. Res. § 4-1210, it could have done so when the statute was first enacted. Mr. Hayden suggests that because Nat. Res. § 4-1210 has remained unchanged since its enactment in 2011, the legislature "intentionally included an element of culpability by requiring that the offender knowingly commit the acts prohibited by

statute." Additionally, Mr. Hayden asserts that the legislature's intent of Nat. Res. § 4-1210 being a specific intent offense is clear "when the statute is read in conjunction with the entire subtitle and specifically when read in conjunction with the penalties set forth in Nat. Res. § 4-1201."

Mr. Hayden contends that "[w]hen the definition of a crime consists of only the description of a particular act, without reference to the intent to do a further act or achieve a further consequence, we ask whether the defendant intended to do the proscribed act." Mr. Hayden relies on several cases in which the court reviewed criminal statutes for a specific intent element for his contention, specifically *Liparota v. United States*, 471 U.S. 419 (1985) (interpreting the federal statute prohibiting food stamp fraud to require proof that the defendant know that his actions violated the law); *Chow v. State*, 393 Md. 431, 473 (2006) (holding that a defendant "must know that the activity [he is] engaging in is illegal" in order to be convicting of illegally transferring a regulated firearm); and *Greenway v. State*, 8 Md. App. 194 (1969) (holding that a defendant's knowledge or criminal conduct may be inferred from circumstantial evidence).

Finally, Mr. Hayden contends that the penalty sections in Nat. Res. § 4-1201 further indicate the legislature's intention to include a specific intent requirement for Nat. Res. § 4-1210. Mr. Hayden notes that some of the penalties enumerated in Nat. Res. § 4-1201 contain a "knowing requirement" while others do not. Mr. Hayden interprets this fact to mean that those penalties with a "knowing requirement" require a higher level of culpability from the defendant, particularly where, as in this case, the penalty is harsh.

The Department does not agree. It asserts that "knowingly" in § 4-1210 does not refer to a licensee's substantive knowledge of the law but rather to the licensee's state of mind when he or she commits one of the predicate violations listed in the statute. In effect, the Department suggests that we should interpret "knowingly" in § 4-1210 as being more or less synonymous with "consciously" or "deliberately." We agree with the Department.

1.

Deciding what "knowingly" means in Nat. Res. § 4–1201(b)(2) is an exercise in statutory construction. Statutory construction involves:

> an examination of the statutory text in context, a review of legislative history to confirm conclusions or resolve questions from that examination, and a consideration of the consequences of alternative readings. "Text is the plain language of the relevant provision, typically given its ordinary meaning, viewed in context, considered in light of the whole statute, and generally evaluated for ambiguity. Legislative purpose, either apparent from the text or gathered from external sources, often informs, if not controls, our reading of the statute. An examination of interpretive consequences, either as a comparison of the results of each proffered construction, or as a principle of avoidance of an absurd or unreasonable reading, grounds the court's interpretation in reality."

*Blue v. Prince George's County*, 434 Md. 681, 689 (2013) (quoting *Town of Oxford v. Koste*, 204 Md. App. 578, 585–86 (2012), *aff'd*, 431 Md. 14 (2013)).

A.

The first step is to look at the plain language of the statute in context. "Knowingly" is defined neither in Nat. Res. § 4-1210 nor elsewhere in the Natural Resources Article. Thus, "we look to the ordinary and popular understanding of the word . . . to determine its meaning." *Chow v. State*, 393 Md. 431, 445 (2006). In this exercise, courts focus on

dictionary definitions that predate the enactment of the statute in question. *See*, *e.g., Chow*, 393 Md. at 446–47; *Lowery v. State*, 430 Md. 477, 491 (2013).

The 2009 edition of Black's Law Dictionary defined "knowing" as:

> 1. Having or showing awareness or understanding; well-informed <a knowing waiver of the right to counsel>. 2. Deliberate, conscious <a knowing attempt to commit fraud>. — knowingly, *adv*.

B. GARNER, BLACK'S LAW DICTIONARY 950 (9th ed. 2009).

Oran's Dictionary of the Law defined "knowingly" as "[w]ith full knowledge and intentionally; willfully." D. Oran, ORAN'S DICTIONARY OF THE LAW 292 (4th ed. 2009).

Webster's Third New International Dictionary defined "knowingly" as "with awareness, deliberateness, or with intention." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1252 (1986).

As mentioned earlier, Mr. Hayden places great reliance upon the definition of "knowingly" contained in an earlier edition of Black's Law Dictionary (emphasis added):

> with knowledge, consciously; intelligently; willfully; or intentionally.
>
> *A person acts knowingly with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist, and (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.* Model Penal Code § 2.202.

BLACK'S LAW DICTIONARY 784 (5th ed. 1979).

We do not believe that Mr. Hayden's reliance on this definition is particularly persuasive. The italicized portion of this definition was derived verbatim from the American Law Institute, MODEL PENAL CODE ("MPC") § 2.02(2)(b) (1962). Section 2.02

of the Model Penal Code, titled "General Requirements of Culpability," defines the mental state(s) necessary for a finding of guilt under various standards found in criminal statutes. Maryland has not adopted MPC § 2.02 in its entirety,[13] and no Maryland court has addressed the Model Penal Code's definition of "knowingly" in a reported appellate decision.

Taken as a whole, these definitions provide, at best, meager support for Mr. Hayden's interpretation of "knowingly" in § 4-1210. That support evaporates when we consider that statute in the context of other provisions in the Natural Resources Article. *See Lowery v. State*, 420 Md. at 496 ("[T]he plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." (quoting *Lockshin v. Semsker*, 412 Md. 257, 275–76 (2010)). In this process, the court "will interpret a statute so as 'to give every word effect, avoiding constructions that render any portion of the language superfluous or redundant.'"

---

[13] *Compare Jones v. State,* 440 Md. 450, 457 (2014) ("This Court has already disagreed with . . . the Model Penal Code's supposition that the 'natural and probable consequences' doctrine predicates liability on . . . negligence[.]" (cleaned up)) *with Wieland v. State*, 101 Md. App. 1, 35 n.1 (1994) (suggesting that Maryland has implicitly equated the MPC's definition of "purposely" with the concept of "specific intent"; and *Beattie v. State*, 216 Md. App. 667, 682 n.6 (2014) (noting that 2011 Md. Laws Ch. 334 amended Crim. Law § 2-210 to provide that "the term 'gross deviation from the standard of care' was to be interpreted synonymously with the term 'gross deviation from the standard of care' under § 2.02(2)(d) of the Model Penal Code[.]'" (cleaned up)).

*Junek v. St. Mary's Department of Social Services*, 464 Md. 350, 357 (2019) (quoting

*Blondell v. Baltimore City Police Department*, 341 Md. 680, 691 (1996)).[14]

The relevant statutory scheme is Title 4 of the Natural Resources Article. In deciding

what the General Assembly intended when it used "knowingly" in § 4-1210, the most

significant part of Title 4 is § 4-1006.2(b)(2), which requires the Department to provide

information to each licensee as to closed areas whenever the Department issues an

authorization to harvest oysters, and further requires the licensee to acknowledge receipt

of that information on a form prepared by the Department.[15] As we have discussed, when

Mr. Hayden renewed his authorization to commercially harvest oysters in 2016, he stated

to the Department that he "acknowledge[d] [his] responsibility as a licensed shellfish

harvester to know and comply with all the laws governing shellfish including harvesting[.]"

---

[14] The rare exception to this principle is when it is clear that "the Legislature 'could not possibly have intended the words to be in the statute.'" *Firestone Tire & Rubber Co., Inc. v. Supervisor of Assessments of Wicomico County*, 275 Md. 349, 353 (1975) (quoting *Baltimore City v. United Stores*, 250 Md. 361, 368 (1968)). Neither party makes such an assertion in the present case.

[15] Section 4-1006.2 reads in pertinent part:

(a) The Department annually shall publish maps and coordinates of oyster sanctuaries, closed oyster harvest reserve areas, and areas closed to shellfish harvest by the Department of the Environment.

(b)(1) The Department shall provide the publications required under this section to each tidal fish licensee who pays the oyster surcharges required under § 4-701(g) of this title.

(2) Before a person may catch oysters under a tidal fish license that has an oyster authorization and for which the oyster surcharges have been paid, the person shall certify to the Department on a form the Department prescribes that the person received the publications required under this section.

In our view, § 4-1006.2 is part of a regulatory scheme that, in the words of the Department, "imputes a significant volume of knowledge to the licensee as a condition of participating in the commercial oyster harvest." Section 4-1006.2 mandates the Department to provide up-to-date information regarding closed areas to licensees when it issues authorizations to engage in commercial oyster harvesting. Accepting Mr. Hayden's argument that "knowingly" means a subjective awareness of the law would require us to conclude that the General Assembly intended to permit licensees to opt out of the regulatory scheme by the simple expedient of ignoring the information that the Department is required by law to provide them. It is difficult for us to conjure up a more effective way of hamstringing the intent of the Legislature.[16]

Moreover, the way in which "knowingly" is used elsewhere in Title 4 is not consistent with Mr. Hayden's argument.

For example, Nat. Res. § 4-220 provides that the Department may immediately suspend a recreational fishing license for, among other reasons, "[k]nowingly making a false statement in an application."[17] The gravamen of this offense is clearly the conscious

---

[16] Section 4-1210 was enacted to strengthen what were widely perceived to be inadequate penalties for violating the statutes and regulations protecting the Bay's oyster habitats. We will discuss this legislative history in part 1.B of this opinion.

[17] Section 4-220 reads in pertinent part (emphasis added):

> (a) In addition to any other penalty provided by the provisions of this title, the Secretary may revoke or suspend any recreational license issued to any person under this title.

* * *

or deliberate making of a false statement and not the knowledge that the licensee knew that making such a statement was a violation of the law when the statement was made.

Nat. Res. § 4-508 makes it a crime for a person commanding a vessel to "pass knowingly, wantonly, maliciously, or as a result of gross negligence, through any [fishing] net lawfully placed and marked" in the waters of the State. If, as Mr. Hayden suggests, "knowingly" means an awareness that the act is unlawful, then the law would prohibit wanton, reckless and grossly negligent conduct but would permit a person to deliberately steer a boat through a legally emplaced fishing net without risk of sanction. This would be an anomalous result if the purpose of the statute is to protect fishing nets from damage by passing watercraft.

In the same vein, Nat. Res. § 4-613(b) provides that, if an individual is convicted of using another person's anglers license, the license is revoked, and the licensee is barred from obtaining a new license for one year. However, subsection (b) of the statute states that "the provisions of this section do not apply to a licensee who does not knowingly give his license to another." *Id.* Under Mr. Hayden's interpretation, the statute would not apply to an individual who gave his or her license to another with the full knowledge that the recipient intended to display the license while fishing unless the licensee subjectively knew that his action was illegal. This seems to be a strange result. Nat. Res. § 4-2A-03(c)

---

(c)(2) The following are grounds for an immediate suspension of a license issued under this title:

(i) *Knowingly* making a false statement in an application[.]

- 24 -

prohibits "common or contract carrier[s]" from "knowingly transport[ing] or receiv[ing] for shipment any fish deemed to be in need of conservation." In this statute, "knowingly" clearly refers to an awareness that the species of the fish in question have been declared to be in need of conservation and not that transporting the fish is a violation of the law. [18]

Finally, we consider Nat. Res. § 4-1201(f), which states (emphasis added):

> In addition to any other applicable penalty set forth in this title, a person who unlawfully takes oysters from a leased oyster bottom, an oyster sanctuary, an oyster reserve, or an area closed to shellfish harvest by the Department of the Environment, *when the area is designated and marked by buoys or other signage or the person knew or should have known that taking the oysters from the area was unlawful*, is subject to a fine not exceeding $3,000.

In our view, § 4-1201(f) demonstrates that, when the imposition of a sanction under Title 4, Subtitle 12 of the Natural Resources Article is conditioned upon an individual's actual or constructive knowledge of the law, the General Assembly knows how to make its intent clear. Section 4-1201(f) is the exception that proves the rule.

B.

We turn to the legislative history of Nat. Res. § 4-1210. The statute was added to the Code by chapter 427 of the Acts of 2011, which originated as Senate Bill 159. S.B. 159's companion bill in the House of Delegates was House Bill 273. Neither bill was substantively amended after introduction.

---

[18] Nat. Res. § 4-1211 contains the same language of § 4-1210 but applies to poaching striped bass and crabs. In that regard, Nat. Res. § 4-1211 permits the Department to seek revocation of a licensee's authorization to engage in harvesting striped bass or crabs if that person "knowingly" has committed one of five enumerated offenses, which relate to the exact offenses listed in § 4-1210(a)(2). There are no reported Maryland appellate decisions that address the meaning of "knowingly" in § 4-1211(b)(2).

We begin with the floor reports, which are "key legislative history document[s]." *Blackstone v. Sharma*, 461 Md. 87, 130 (2018). The Senate Education, Health, and Environmental Affairs Committee and the House Environmental Matters Committee issued floor reports on, respectively, S.B. 159 and H.B. 273. Each floor report contains a summary of the current law, a summary of the bill at issue, and a favorable recommendation for that bill. Although the language in the floor reports is not identical, each report used the language of the bill itself to summarize it. To summarize subsection (b)(2), the floor reports state: "[i]f the presiding officer finds or concludes the licensee knowingly committed the offense, the DNR must revoke the licensee's tidal fish license for commercial oyster harvesting." Neither of the floor reports contain any elaboration of what "knowingly" means in the context of the statute.

The Fiscal and Policy Note for Senate Bill 159 observed that oyster levels in the Chesapeake Bay had been at 1% of historic levels since 1994, and that oyster bars had decreased by 80%. In response to these historic lows, the Department, in 2009, established a restoration plan that called for a substantial increase oyster sanctuaries in the Bay, establishing oyster aquaculture leasing opportunities, and maintaining the majority of the Bay's oyster habitat for public oyster harvesting. In conjunction with the restoration plan, the Department focused not only on preserving and promoting healthy aquaculture activity, but also on "strengthening enforcement of commercial fisheries laws." *See* S.B. 159, FISCAL AND POLICY NOTE, (February 3, 2011). Like the floor reports, the fiscal and policy note used the language of the bill itself in summarizing it, and so provided no particular insight of what the General Assembly intended "knowingly" to mean.

- 26 -

S.B. 159 added a new administrative penalty system to augment the existing laws pertaining to violations of the State's oyster regulations. A coalition of State and local agencies, as well as a number of local and regional environmental nonprofit organizations, supported the bill.[19] For example, the written testimony submitted by the Chesapeake Bay Commission[20] stated:

> The current system of fines and suspensions does not deter offending commercial fisherman who violate the law and is simply accepted as the cost of doing business. This is evident from the estimate of illegal oysters harvested from restored oyster bars, both commercial bars and sanctuaries. The University of Maryland Horn Point Laboratory in Cambridge is the leading oyster agriculture hatchery in the Chesapeake Bay, producing over 1 billion oyster spat . . . within the past decade. At our November 2009 meeting, the Director of Horn Point's oyster hatchery estimated that nearly 80% of oysters produced at the hatchery and returned to sanctuary reefs had been poached illegally.
>
> Illegal harvesting of oysters is an offense against public taxpayer investment and the public trust. The State of Maryland has spent $40 million on oyster restoration since 1996. A knowing violation of the laws meant to protect our public investment warrants severe repercussions.

---

[19] The State agencies included the Maryland Department of Natural Resources; the Maryland Department of Agriculture; the University of Maryland Center for Environmental Science Horn Point Laboratory Oyster Culture Facility; the Wye Research and Education Center; as well as one interstate agency, the Chesapeake Bay Commission. The County agency was the Baltimore County Department of Environmental Protection and Sustainability. The nonprofit organizations included the Chesapeake Bay Foundation; the Sierra Club, Maryland Chapter; Environment Maryland; and the Coastal Conservation Association.

[20] The Chesapeake Bay Commission is a tri-state organization consisting of officials from Maryland, Virginia, and Pennsylvania. *See* Nat. Res. § 8-301.

Statement of the Chesapeake Bay Commission concerning House Bill 273[21] (February 16, 2011).

For its part, the Chesapeake Bay Foundation stated:

> Oyster poaching is a rampant problem in Maryland. Nearly all of the State's existing sanctuaries have been victimized by poachers. . . .
>
> $*$  $*$  $*$
>
> [W]e believe that the strongest part of SB 159 is the requirement that the DNR hold hearings for oyster-related offenses, and revoke an individual's license if he or she is found culpable. This will ensure that poachers will no longer be allowed to harvest alongside their law-abiding peers. To a commercial fisherman, the clear and realistic threat of losing a license is a strong deterrent to stealing oysters.

Statement of the Chesapeake Bay Foundation concerning Senate bill 159 (February 8, 2011).

There is nothing in the legislative history that challenges the validity of these observations.[22]

To be sure, position statements by state agencies and interest groups are not infallible guides to the intent of the Legislature. *See* Jack Schwartz and Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: the Use and Misuse of Legislative History*, 54 MD. L. REV. 432, 463 (1995) (Courts "should avoid citing testimony or letters from individuals outside the General Assembly as evidence of legislative purpose unless the court explains

---

[21] House Bill 273 was the companion bill of SB 159.

[22] In fact, there is nothing in either bill file expressing opposition to, or a concern about, the proposed law.

the basis on which it draws the inference that the material reliably indicates legislative purpose."). However, in this instance, the clear and unchallenged consensus among the public agencies and respected nonprofit organizations that commented on the proposed legislation provides insight into the "problem [that the] advocates put before [the Legislature]." *Id.* at 463. And the problem was that the then-current criminal penalties and civil sanctions were inadequate to protect the Bay's oyster habitat. Specifically, criminal prosecutions often resulted in violators receiving fines. Instead of acting as a deterrent, the fines were viewed by some watermen as merely a cost of doing business. Mere suspension of a license allowed repeat offenders to return to the oyster fishery and, potentially, commit further violations.[23]

In response to these concerns, S.B. 159 authorized permanent revocation, and not merely temporary suspension, of a licensee's authorization to engage in commercial oyster harvesting. S.B. 159 also required the Department to initiate revocation proceedings whenever a licensee was charged with committing one or more of the predicate offenses, and required the Department to revoke the license if an administrative law judge finds that the licensee "knowingly" committed a predicate offense. Although the sanction imposed by Nat. Res. § 4-1210—lifetime revocation of authorization to engage in the oyster

---

[23] The particular agencies and organizations who voiced these concerns were the Department of Natural Resources, the Chesapeake Bay Foundation, Chesapeake Bay Savers, the Coastal Conservation Commission, and the Chesapeake Bay Commission.

fishery—is harsh, it was a measure deemed necessary by the General Assembly to strengthen what was perceived as an ineffective system of criminal and civil penalties.

We conclude that the legislative history of § 4-1210 provides no support for Mr. Hayden's proposed interpretation of "knowingly" in the statute.

<center>C.</center>

In his brief, Mr. Hayden points to the holdings and analyses in *Liparota v. United States*, 471 U.S. 419 (1985); *Chow v. State*, 393 Md. 431 (2006); and *Greenway v. State*, 8 Md. App. 194 (1969), to support his argument that Nat. Res. § 4-1210 requires the Department to prove that the licensee was aware that he or she was violating the law when committing the predicate offenses. These cases analyze the ways that address the concept of *mens rea* in prosecutions for violating statutes that used the term "knowingly": food stamp fraud (*Liparota*), illegally transferring firearms (*Chow*), and possessing automobile engines with defaced or altered vehicle identification numbers (*Greenway*).

These decisions are not particularly relevant because in none of them was the government required to provide notice of the applicable legal requirements to the defendant, nor did the defendant affirmatively represent to the government under penalty

of perjury that he was aware of his obligation to "know and comply with" the relevant statute.[24]

We hold that "knowingly" as used in Nat. Res. § 4-1210(b)(2) means "deliberately" or "intentionally."

---

[24] In *Liparota*, the Supreme Court held that a statute (7 U.S.C. § 2024(b)(1)), which imposed criminal penalties upon any person who "*knowingly* uses, transfers, acquires, alters, or possesses [food stamps] in any manner not authorized by [the statute] or the regulations" (emphasis added), required the prosecution to prove that "the defendant knew his conduct to be unauthorized by statute or regulations." 471 U.S. at 425. Among the concerns identified by the Supreme Court was that a "strict reading of the statute with no knowledge-of-illegality requirement" would criminalize a variety of otherwise blameless behaviors. *Id.* at 426.

In *Chow v. State*, 393 Md. 431 (2006), the Court of Appeals reviewed the meaning of "knowingly" as used in the statute penalizing a person who "*knowingly* participates in the illegal sale, rental, transfer, purchase, possession, or receipt of a regulated firearm[.]" 393 Md. at 434 n.3 (emphasis added). The Court read a "*mens rea* requirement of specific-intent" into the statute and held that "in order to be in violation of [the statute], a person . . . must know that the activity they are engaging in is illegal." *Id.* at 473.

The statute at issue in *Greenway* was former Article 66 1/2 § 73, which stated in pertinent part (emphasis added):

> Any person who *knowingly* . . . has in his possession . . . [an] engine removed from a motor vehicle, from which the manufacturer's serial or engine number or other distinguishing number or identification mark or number . . . has been removed, defaced, . . . or destroyed *for the purpose of concealing or misrepresenting the identity of said . . . engine . . .* is guilty of a misdemeanor.

8 Md. App. at 194.

We concluded that the statute did not require proof that the defendant knew the conduct was unlawful but rather that the defendant "had actual or direct knowledge, as, for example, that he defaced the [vehicle identification] number himself, or admitted that he knew it had been defaced, and had no reasonable non-culpable explanation as to why it had been defaced." *Id.* at 196.

Our next step is to determine whether there is substantial evidence in the record to support the administrative law judge's conclusion that Mr. Hayden acted deliberately or intentionally on the morning of February 25, 2017. We conclude that there is.

At the administrative hearing, there was no dispute that Mr. Hayden intentionally harvested oysters from a location more than 200 feet within a closed area, a violation of Nat. Res. § 4-1006(b). (In fact, he was 1,198 feet into the closed area.) Mr. Hayden's only defense was that he did not know his actions violated the law. The administrative law judge was correct in concluding that Mr. Hayden's "riparian rights" defense was irrelevant. The evidence at the hearing showed that the deed to Mr. Hayden's parents included the right to use the bottom of Whites Neck Creek adjacent to their property for "oyster planting and cultivation," but there is no basis in the law to assert that this riparian right trumped the State's authority to regulate oyster cultivation and harvesting. Mr. Hayden's contention regarding his subjective (mis)understanding of his rights under the deed fails for three reasons.

*First*, knowledge of the law was imputed onto Mr. Hayden by virtue of his signature on the receipt, by which he acknowledged that he knew or was required to know the law, as well as his acceptance of the Shellfish Closure Manual, detailing the areas of the Chesapeake Bay closed to oyster harvesting.

*Second*, the issue of whether Mr. Hayden needed "a riparian lease" is separate from and irrelevant to the issue on appeal. As the administrative law judge noted, the answers provided by Mr. Wright to Mr. Hayden and Mrs. Hayden regarding needing a lease were

not false, as there is no requirement that a property owner obtain a riparian lease for riparian oyster beds. But it was not clear that either Mr. Hayden or his wife expressed to Mr. Wright the intention to relay oysters from a closed area, which is the actual issue in this case, when they asked if a lease was required for him to harvest oysters on bottom land that was subject to his parents' riparian rights.

*Third*, Mr. Hayden's conversation with Ms. Bohan, the MDE employee, demonstrates that he was aware that White Hall Creek was closed to oyster harvesting because of pollution.

Finally, this same evidence supports the alternative basis for the administrative law judge's decision, namely, that Mr. Hayden deliberately ignored information at his disposal when he chose to relay oysters from a closed area. "Deliberate ignorance . . . exists when a person 'believes it is probable that something is a fact but deliberately shuts his or her eyes or avoids making reasonable inquiry with a conscious purpose to avoid learning the truth.'" *Steward v. State*, 218 Md. App. 550, 560 (2014) (quoting *Rice v. State*, 136 Md. App. 593, 601 (2001)). As the administrative law judge observed, Mr. Hayden's "failure to read and digest these laws and requirements is no excuse for violating the requirements."

**THE JUDGMENT OF THE CIRCUIT COURT FOR ST. MARY'S COUNTY IS AFFIRMED. APPELLANT TO PAY COSTS.**